Davis, Judge,
delivered the opinion of the court:
We are requested by the House of Representatives, under 28 U.'S.C. §§ 1492 and 2509, to determine whether plaintiff is *4 legally or equitably entitled to an award on its claim that it suffered injury as a result of an excessive profits determination under the World War II renegotiation legislation.[1]
The late Commissioner Eobert K. McConnaughey, after a full trial, filed a careful, detailed, and thorough set of findings. Both parties except to certain of his findings — the plaintiff somewhat more than the defendant — but we are satisfied, after reviewing these exceptions, that they should not be disturbed and that neither side has presented enough reason for rejecting them or for substituting new ones. See, e.g., J. G. Watts Constr. Co. v. United States, 174 Ct. Cl. 1, 10-11, 355 F. 2d 573 (1966); Dodge Street Building Corp. v. United States, 169 Ct. Cl. 496, 501, 341 F. 2d 641, 644-45 (1965). We therefore adopt as our own, with only minor changes, the commissioner’s findings. Their narrative clarity and rich explanatory detail, in addition to pointing the way to the proper result, enable us to limit this opinion to a mere sketch of the facts.
Aurex Corporation is a family-owned company which, from its founding in 1935 until the fall of 1944, was very successful in the manufacture and sale of an electronic hearing aid. By 1944 the company was one of the leaders in the industry (probably the dominant producer), with a superior instrument, effective sales organization, sufficient resources, and a comfortable manufacturing set-up employing about 90 persons. It had accommodated itself to the conditions of wartime production and was able to obtain supplies because hearing aids were given a high material priority as prosthetic devices.
Aurex’s connection with war work, to which it attributes its post-war predicament, came about in 1944 because the Navy was searching for an effective electrical device (called a solenoid) to arm properly the bombs dropped in combat from the wings of certain Navy aircraft. On the one hand, the arming devices were supposed to activate the bomb, at the *5 appropriate moment, so that it would explode on contact with or near the target; on the other hand, the same or a similar mechanism was to keep the bomb from activating at unsuitable times, for instance when the plane landed back on the carrier. The Navy had been having difficulty in creating a solenoid which would not bum out, cease to function, and thereby cause the arming mechanism to work at the wrong time or to fail to operate when it should. The consequence would be duds on target and, on some occasions, explosions on carriers or bases. The quest was therefore for a solenoid— small in size so as to fit neatly into a 'bomb-rack — capable of functioning continuously throughout the period required for a bombing mission.
Almost by chance the Navy was put in touch, early in 1944, with Mr. Walter Huth, plaintiff’s president and prime official, as someone who might help because one component of the Aurex hearing aid was related to the types of solenoid for which the Navy was looking. As a patriotic gesture Mr. Huth and his staff developed a solenoid which the Government found useable. Plaintiff first produced, at the Navy’s request, a pilot lot of 50 such solenoids (for which it was paid). Then, at the Navy’s insistence, the prime contractors for one of the bomb-racks, of which the solenoid was to be a part, subcontracted to Aurex the volume production of arming solenoids to be used in that form of bomb-rack.[2] From the latter part of 1944 until the end of actual hostilities in August 1945, plaintiff was the sole source of these solenoids; it also made a large number of release solenoids (designed to activate the bomb-release mechanism). These Aurex products were dependable and efficiently supplied; plaintiff was a good contractor which made a real contribution to the war effort. The trial commissioner has also found, and we accept his determination, that plaintiff entered war production through a genuine desire to make its services and facilities available, for a reasonable return, to meet an apparent need of the Navy in a way which would aid the war effort. During this period of war work plaintiff did not continue the *6 manufacture of hearing aids, nor did it do research in planning for its post-war hearing aid business; but it did continue to sell the aids already in stock and to maintain some sort of distributing system as best it could.
As of March 31, 1946, the end of the fiscal year during which plaintiff’s war contracts ended, its working capital was $621,669.83, as compared to $181,590.37 at the close of the fiscal year preceding its involvement in war business; its ratio of current assets to current liabilities was 23.86 to 1, in comparison with 2.81 to 1 before the solenoid contracts. The profit for fiscal 1944, without war work, was about $144,000 (in 1943 there was a small loss); for fiscal 1946 the profit was $275,595.[3]
After the war Aurex returned to hearing aids, but, beginning about March 1946, there was a rapid decline in its financial resources for quite some time. It was unable to regain or maintain its prior place in the hearing aid industry and suffered severe losses in fiscal 1947,1948, and 1949. Though the company appears thereafter to have recouped somewhat, it never regained its former dominant position in the commercial market for hearing aids. The major problem in the case is whether (and to what extent) the Government should be held responsible for this post-war toboggan slide.
The crux of the problem, in plaintiff[1]’s eyes, was the course of the statutory renegotiation to which Aurex was subjected after the close of World War II. Like almost all war contractors, the company had to undergo renegotiation to eliminate excessive profits on its war contracts. In June 1946, an agent of the Navy Price Adjustment Board (the renegotiating agency) recommended that the profits on renegotiable war business were excessive to the extent of $70,000, for the calendar year 1945 and the first three months of 1946 (the end of plaintiff’s fiscal year). This would have meant a renegotiation liability of $28,000 after appropriate tax credits, and plaintiff agreed to accept that determination. The Board, however, had another view. In August 1946 it proposed to increase the excessive profits to $150,000. Aurex contested that figure, and meetings were held with the Board *7 in the fall of 1946 and in June 1947. At the latter, the Board finally concluded that a renegotiation refund of $240,-000 was owing for the renegotiable period (Jan. 1, 1945-March 31, 1946). This meant a net payment, after tax credits, of $114,118.07.
The only means of challenging the Board’s determination, in 1947, was an appeal to the Tax Court for a redetermination under the Renegotiation Acts. See Lichter v. United States, 334 U.S. 742, 789-93 (1948). Plaintiff’s management, discouraged by the difficulties of meeting the renegotiation liability established by the Board and of keeping civilian operations going while contesting that determination in the Tax Court, agreed with the Government (in September 1947) to accept the $240,000 fixed by the Board as the company’s excessive war-contracts profit. Of the $114,118.07 owing after tax credits, plaintiff actually paid only $7,280. In October 1951, sometime after the filing of a collection suit by the Government which had the effect of compelling Aurex to pay cash in advance for all of its purchases, a settlement was made with the Department of Justice for $5,000; previously $2,280 had been applied by the defendant against other sums due Aurex.
Plaintiff admittedly has no legal claim against the Government. For one thing, the settlement in 1951 included a release of all legal liability (though expressly reserving the right to seek Congressional relief). See Harvey-Whipple, Inc. v. United States, 169 Ct. Cl. 689, 696-700, 342 F. 2d 48, 51-54 (1965). For another, any legal claim was long ago wiped out by the statute of limitations. But neither the bar of limitations nor the release (with its explicit exception) precludes an “equitable” claim of the kind previously considered in our Congressional reference determinations. See Schutt Constr. Co. v. United States, 173 Ct. Cl. 836, 840-41, 353 F. 2d 1018, 1020-21 (1965); Harvey-Whipple, Inc. v. United States, supra, at 699, 342 F. 2d at 53-54; Rocky River Co. v. United States, 169 Ct. Cl. 203, 207-08 (1965); North Counties Hydro-Electric Co. v. United States, 170 Ct. Cl. 241, 248-49 (1965); MacArthur Mining Co. v. United States, 167 Ct. Cl. 143, 146 (1964); Clark v. United States, 167 Ct. *8 Cl. 197, 199 (1964); Dickson v. United States, 159 Ct. Cl. 185, 190 (1962).[4]
In passing upon plaintiff’s equitable claim we do not gire any weight to the facts, in and of themselves, that the company’s hearing aid business may have suffered because of World War II, or because Aurex undertook war contracts, or because it was liable to renegotiation. These were wartime burdens imposed generally on large sectors of the commercial and industrial community. “In total war it is necessary that a civilian make sacrifices of his property and profits with at least the same fortitude as that with which a drafted soldier makes his traditional sacrifices of comfort, security and life itself.” Lichter v. United States, supra, 334 U.S. at 754. Congress has not provided generally for recompense, through Government payments, to all businesses which suffered such detriment in World War II, and it would be unjustified special treatment to single out one business for such relief unavailable to the multitude of others in the same class. Stone v. United States, 160 Ct. Cl. 128, 132 (1963). Plaintiff does not seek such discriminatory treatment but places its case, not on the burdens of wartime per se, but on the particular course of the particular renegotiation proceedings to which it was subjected from 1946 to 1951. We assess the claim on that basis.
Aurex starts from the position that the renegotiation refund ultimately demanded by the Price Adjustment Board was grossly unjust, failing to take account, on the one hand, of the company’s contribution to the war effort and, on the other, disallowing losses suffered by the hearing aid business in the renegotiated period (January 1945-March 1946) as a result of the undertaking of the war contracts. This unfair treatment, it is argued, left plaintiff financially strapped at the time of reconversion to civilian work and prevented it from regaining its rightful place in the industry. In particular, the contention is that the existence of the large re *9 negotiation liability of $240,000 fixed by tbe Board, together with the defendant’s insistence on collecting that sum before the proper amount could be redetermined in the Tax Court, deprived the company of any remedy and impaired its credit and its ability to finance its projected peacetime operations. If it were not for these obstacles, plaintiff says, it would have prospered and indefinitely continued to earn good profits. In figures, the maximum claim is for more than five and a half million dollars — including lost profits (over $3,800,000) ; diminution of principals’ salaries (over $550,000); cost of advertising to reestablish public recognition of plaintiff’s product ($500,000); cost of training distributors and dealers and internal staff (over $550,000); losses on obsolete inventory; and interest and penalties on withholding taxes.
The defendant rejects every link in this reasoning: denigrating Aurex’s contribution to the war effort; insisting that the war contracts did not injure plaintiff’s hearing aid business during or after the war; denying that the renegotiation was unfair in any way; attributing the company’s postwar difficulties to its own mistakes, lack of aggressiveness, and stand-pattism; and finding no reason why the Government should pay anything at all, either in equity or in law, to plaintiff.
Commissioner McConnaughey took, we think, the right line, basing his conclusions on a painstaking evaluation of the evidence with which (as already indicated) we concur. He found, first, that Aurex had made a decided war contribution. He then found that at the end of March 1946 (the close of the renegotiation period) plaintiff appeared to be in the best financial condition in its history. The two weaknesses, both due to the concentration on war work, were (a) that its sales organization had atrophied at a time of great and increasing advances in the hearing aid business, and (b) that the pre-war-work Aurex product was commercially obsolete while other concerns, which had no war contracts, were spurting ahead. Plaintiff tried to recoup its standing immediately after the war, but the commissioner found that it failed with a new model in 1947, not because of its war work or the *10 renegotiation,[5] bnt because of wholly unrelated judgments and problems (including some technical mistakes).[6] The renegotiation proceeding did begin to have an effect on credit and financing in the latter half of 1947.
As for the renegotiation itself, it was found adequate on some challenged points and insufficient in one important aspect. The Board was not faulted for disallowing, as a cost of the renegotiable war business, a claim for “sales and commission expense” attributed by plaintiff to the effort to maintain the hearing aid business in some form during the period of the war contracts; plaintiff did not show what part of these costs was due to a lack of salable instruments caused by the concentration on war production and what proportion was tied to the general frustrations of finding adequate personnel in wartime. The disallowance of an inventory loss (for perishable hearing aid parts) was similarly upheld; plaintiff did not prove that it was deprived of the use of these parts by its centering on solenoid production. The $95,000 allowed by the Board for the cost of developing the solenoid was also sustained as proper.
The flaw in the renegotiation was the failure to accord a sufficient credit for Aurex’ contribution to the war effort — a factor which was expressly made significant by the statute and the regulations. The chairman of the Board indicated that it had allowed $150,000 on this account, but the commis *11 sioner rightly found that, though there was discussion of this sum, it was never actually applied to reduce the excessive profits otherwise determined. If that credit had been applied as it should, the gross amount of the renegotiation liability would have been $90,000 (instead of $240,000) and the net due after tax adjustments would have been about $36,500 (instead of $114,118.07).
This drastic and unexplained overstatement of the company’s renegotiation liability, in 1947, clearly affected its peacetime activities. The obligation to pay $240,000 ($114,-000 net) was an adverse factor in all its dealings with existing or potential creditors, and, once the Government brought suit to collect (apparently in 1948), plaintiff had to pay cash for materials and supplies. The delay in the Board’s action until mid-1947 also added somewhat to the financial difficulties. We think, as did the commissioner, that on this basis plaintiff has an equitable claim for relief because of the Board’s grave error (taken together with the course and protraction of the renegotiation proceeding). The failure to insist on a unilateral determination and then to appeal to the Tax Court, although a bar to a legal claim (Lichter v. United States, supra), should not in this instance stand in the way of an equitable remedy through Congressional action. The net liability of some $115,000 would probably have had to be satisfied long before the Tax Court acted, and undoubtedly it would have been a great hardship (if possible at all) for plaintiff to keep operations going, and to obtain credit, after such a large payment. In this equitable proceeding we hold that Aurex had a sufficient excuse for foregoing its right to appeal to the Tax Court.
We agree with the commissioner, however, that this serious error in the renegotiation cannot ground the enormous recovery plaintiff seeks. It may be that the reduction in the renegotiation liability which should have been made in 1947 would have enabled Aurex to obtain the financing and credit it appears to have lacked, but the record is far too infirm to allow us to speculate that prosperity would necessarily, or even probably, have ensued. As the commissioner put it *12 (finding 60 (f)): “In summary, the hypothetical availability of whatever additional credit the plaintiff might have obtained if its renegotiation liability had been less does not in itself afford any guaranty, either that the plaintiff’s business would have become again as successful in relation to the overall fortunes of the hearing aid business as it was in 1944, or that it would have continued so until today.” The difficulty is not simply one of determining precisely how well Aurex would have done if the excessive profits had been correctly fixed; we cannot even find with any solidity that it would have done better than it did or made any substantial profits. Lost profits should not be granted without well grounded proof that they would in all probability have been made. United States v. Penn Foundry & Mfg. Co., 337 U.S. 198 (1949).
The proper basis of recovery, as the commissioner recommended, is to reinstate the credit of $150,000 which the Board said it would grant but never did. If that sum, covering both plaintiff’s direct contribution to the war effort and the risks to its civilian business through focusing on solenoid production, had been taken into account, Aurex would have been permitted to retain overall profits of some $375,000 for the renegotiable period (instead of profits of $225,000 under the Board’s action). When compared to the pre-war-work profit of $144,000 in 1944, this annual rate of over $300,000 appears to allow an adequate amount for the risks of undertaking war contracts and for Aurex’ contribution to the war effort. At the same time, the corrected gross renegotiation liability of $90,000 is only $20,000 more than the tentative obligation fixed by the Board’s representative in June 1946 which the company was willing to accept — and the net liability of $36,000 (after tax credits) would have been only $8,500 more than the $28,000 of net liability under the representative’s acceptable determination. It is a fair inference that, if plaintiff’s liability had been properly established in 1946 or 1947 at $90,000 (gross) or $36,500 (net), it could and would have paid that amount — and could not rightfully complain. The net improvement in the Aurex financial position *13 (see findings 56, 64) would have been about $121,000 (consisting of a reduction of some $77,500 in liabilities and an increase of about $43,500 in cash from additional tax refunds).
This $121,000 should now be restored to plaintiff. By such a payment, at least the financial basis for the additional credit of which the company Was deprived in 1946 would now be replaced. There is the further problem of the delay in payment since 1946. The commissioner concluded that delay-compensation should be made for the $43,500 of extra tax refunds which Aurex would have received in cash if its renegotiation liability had been properly fixed,[7] but that such recompense would not be warranted for the $77,500 of excessive liability imposed on the company in 1947 which it never paid but which, for about four years, impaired its credit. We agree. The part of the award standing in place of the tax refunds should bear interest like other tax refunds. But even in this equitable proceeding there is inadequate ground for departing from the usual rule in this court against interest on non-tax and non-eminent domain awards against the Government (United States v. Thayer-West Point Hotel Co., 329 U.S. 585 (1947)), and for allowing delay-compensation for a sum which the plaintiff would not have had in cash but only in reduced liabilities.
Accordingly, we recommend to the Congress that plaintiff be paid the sum of $172,550 ($121,000 plus $51,550 for delay in payment) on its equitable claim.
This opinion and the findings of fact, together with the conclusions therein, will be certified by the Clerk to the House of Representatives pursuant to House Resolution 630, 85th Congress, 2d Session.
BINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the *14 briefs and arguments of counsel, makes findings of fact as follows:

Findings

The nature of the action- 1-3
The plaintiff- 4-12
Hearing aid industry developments in 1944- 13
The development of the Aurex solenoid-14-20
The defendant’s bomb rack difficulties- 14
The Navy’s efforts to develop effective continuous duty solenoids_15-16
The plaintiff’s part in solving the solenoid difficulty- 17
The Revision “IT” solenoid- 18
The production version of the Aurex solenoid- 19
The designers of the Aurex solenoid- 20
The plaintiff’s volume production of solenoids-21-29
The character of the plaintiff’s contract performance-21-24
The plaintiff’s reasons for undertaking solenoid production- 25
The effect of the plaintiff’s war production on its hearing aid business_26-29
The plaintiff’s situation when its war contracts ended- 30
The course of the plaintiff’s busine'ss after the war-31-32
Renegotiation standards prescribed 'by statute and regulation— 33
History of the renegotiation-34-49
The basis of the renegotiation_50-56
The damages claimed-57-60
The net 'amount of the renegotiation liability_ 57
The amounts paid by the plaintiff against the liability- 58
The nature and amount of the plaintiff’s claim_ 59
The evidence does not support the amount of damages the plaintiff claims- 60
Equitable measures of damage-61-65
Alternative measures of damage not precluded- 61
The credit purportedly allowed by, the Board affords a fair measure of damage-62-63
Restoration of amounts of which the renegotiation deprived tlie plaintiff_ 64
Compensation for delay- 65
Amount of equitable liability- 66

The Nature of the Action

1. This action is brought pursuant to House Resolution 630, 85th Congress, 2d Session. That resolution referred to this court a bill — H.R. 3677, 85th Congress, 1st Session— for a report to the blouse of Representatives of findings of *15 fact and conclusions sufficient to inform the Congress of the nature and character of the plaintiff’s demand “as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States” to the plaintiff.
2. The bill authorizes and directs the Secretary of the Treasury to pay to the plaintiff, out of any money in the Treasury not otherwise appropriated, an unspecified sum “in full settlement of all claims of the said Aurex Corporation against the United States arising out of the detriment suffered by it in producing a bomb arming and releasing device as a result of the determination of excessive profits in a renegotiation proceeding: * *
3. (a) The plaintiff, by its petition, seeks recompense, in general conformity with the bill and the resolution.
(b) The plaintiff does not have, and does not assert, a judicially enforceable legal claim against the defendant. What it seeks is such amount as “in equity and good conscience will compensate it for the losses suffered by it and expenses incurred” as a result of the renegotiation determination.[1]
(c) Among the bases asserted for the plaintiff’s claim is the contention that, in carrying out the renegotiation, the defendant’s representatives, in disregard of the applicable law and regulations, gave inadequate consideration to the nature and extent of the plaintiff’s contribution to the war effort, including its inventive contribution and its cooperation with the Government and other contractors in supplying technical assistance, and to the risks incurred, losses realized, markets lost, and adjustments required as a result of the plaintiff’s participation in war work. The plaintiff not only complains of the amount of the renegotiation liability asserted against it but says that the manner of the defendant’s determination and enforcement of such liability contributed to the detriment it suffered by impairing its credit, *16 destroying its goodwill, and causing losses of profits and inventory, and impairment of its dealer organization.

The Plaintiff

4. The plaintiff is an Illinois corporation, organized in 1935. Its president, since its formation, has been Walter Huth, now over 75 years of age, who has been dominant in directing and supervising its operations. The Huth family owns all the plaintiff’s stock except 5 percent which has been owned by the plaintiff’s attorney since 1952.
5. Before the plaintiff corporation was formed, Mr. Huth had been active for some years in the radio industry in various ways, including research and development, and the manufacture of radio sets and radio-set components. In the course of this work, with the collaboration of his employees and perhaps of other associates, he conceived, developed, and manufactured an electronic hearing aid. This was a box-shaped instrument that used vacuum tubes for amplification of sound. It was superior to the carbon microphone instruments previously available. The plaintiff corporation was organized primarily to manufacture and sell such hearing aids.
6. At the outset, the plaintiff manufactured relatively heavy, cumbersome, boxlike hearing aids that were not adapted to easy portability for use by an individual as a prosthetic instrument, constantly available for amelioration of hearing deficiencies. These early hearing aids were widely used in schools and were successful in alleviating hearing and speech problems of deafened children.
7. In the course of its work with hearing aids, the plaintiff, in the midthirties, developed and manufactured vacuum tubes smaller than those then generally available from other sources. Using such tubes, the plaintiff developed, and in 1938 began marketing, two-piece electronic hearing aids that could be carried by the user on his person with a reasonable degree of convenience. These instruments, in addition to being small enough to be “worn” by the user, provided sufficient amplification of sound, and sufficient fidelity in its *17 reproduction, that they came to be widely bought and used, by persons afflicted with deafness, as an item of personal prosthetic equipment. As a consequence, the plaintiff’s hearing aid business began to expand rapidly.
8. Within a year or two after the plaintiff began marketing its two-piece, portable hearing aids, other tube manufacturers developed new, heat-resisting metal filaments and accomplished additional improvements in tube design. As a consequence, subminiature tubes of improved quality, suitable for use in hearing aids, became generally available. Thereafter, other manufacturers also were readily able (to produce wearable hearing aids and competition for the market for individual prosthetic hearing aids increased.
9. During the period when the United States was mustering its defense facilities, and during the war period, hearing aids were classified as prosthetic devices and were given a high material priority. Accordingly, material shortages did not seriously impair the plaintiff’s operations or those of the hearing aid industry generally. The plaintiff did, however, redesign its two-piece instrument, and brought out a new model in 1942. In 1943 it incurred substantial costs converting approximately 50,000 instruments to use standardized batteries which the War Production Board required to be used in all hearing aids. As a consequence of these and other factors, its profits dropped off in these 2 years, although its sales continued to increase.
10. (a) By 1944 the plaintiff had survived the development costs and limited markets of the early years. It had dealt successfully with various types of problems common to new companies in a new and rapidly developing industry, including the redesign of its product and the costs of new molds and other changes required to produce a new, two-piece model, which had been accepted in the market and was regarded as a superior instrument among the two-piece instruments then generally available.
(b) It had met and overcome such problems as were appurtenant to operating in an economy disrupted by the advent of the war.
*18 (c) It had also survived, and probably had benefitted from, an intensive advertising campaign by one of its large competitors, promoting a new, relatively low-priced hearing aid that had excited greater interest in hearing aids than it had satisfied.
(d) It had developed an effective, and ostensibly loyal, countrywide sales organization. Its advertising program had been limited but its sales had increased progressively through 1943. Sales fell off somewhat in 1944, during part of which it was engaged in war production, but its 1944 hearing aid profits were the second highest in its relatively brief history.
(e) By the spring of 1944, and for several years preceding, the plaintiff was regarded by its competitors as one of the leaders of the hearing aid industry, along with Western Electric, Sonotone, and Acousticon. During that period, only two-piece or three-piece, wearable hearing aids were generally available. The Aurex product, although relatively expensive, was regarded as one of the best of these.
(f) The making of hearing aids was not a complex or especially difficult manufacturing operation. It consisted principally of the assembly of components furnished to the principal manufacturer by various suppliers who furnished some standard components and made others in accordance with the principal manufacturer’s design and specifications. Accordingly, the plaintiff’s manufacturing facilities were not extensive or elaborate. Its personnel, engaged in making the hearing aids, was not large (somewhere around 90), and its financial resources appear to have been adequate to sustain its operations comfortably and to meet the requirements of its expanding business.
11. The record of the plaintiff’s sales and hearing aid profits through fiscal 1944 were as follows:
Year: Net sales Profits
1939. $174,874 $12,594
1940. 387,035 125,281
1941. 514,212 147,811
1942. 527,532 18,510
1943. 723,974 (1,004)
1944. 610,143 about 144,000
*19 12. The plaintiff’s balance sheets, as of the end of 1948 and 1944, were as follows:

Assets *1948 *1944

Cash_ $125, 368. 79 $21, 378. 74
Aects receivable_ 78, 438. 55 162, 438. 06
Less: allowance for doubtful ac-counts_ (14, 834. 62) (16, 695. 15)
Inventory_ 93, 030. 94 188, 536. 80
Machinery & equipment, furniture & fixtures_ 38, 790. 10 51, 855. 54
Less accumulated depreciation_ (17, 727. 49) (23, 465. 64)
Deferred engineering & development costs on war contracts_ 33, 671. 60
Patents_ 36, 000. 00 20, 000. 00
Prepaid insurance_ 2, 466. 52 2, 171. 26
W. H. Iiuth — advances to officers_ 37, 178. 99 1, 281. 39
378, 711. 78 441, 172. 60

Liabilities & Shareholders’ Equity

Accrued expenses_ 22, 408. 97 29, 889. 98
Accounts payable_ 38, 832. 77 60, 371. 92
Notes payable_ 27, 000. 00 27, 000. 00
Reserve for Federal income taxes_ 20, 000. 00
Reserve for licenses_ 12," 171.” 55
Reserve for contingencies_ 20, 000. 00 20, 000. 00
Reserve for contract guarantees_ 15, 000. 00 15, 000. 00
Reserve for capital stock tax_ 2, 125. 00
Preferred stock_ 64, 000. 00 64, 000. 00
Common stock_ 36, 000. 00 36, 000. 00
Surplus_ 141, 173. 49 168, 910. 70
378, 711. 78 441, 172. 60
•Consolidated figures.

Rearing Aid Industry Developments in 1944

13. (a) About the middle of 1944, at approximately the same time as the plaintiff became committed to war production for the defendant in the manner hereafter described, a new, aggressive manufacturer, named Beltone, which had been producing a hearing aid in small but increasing quantities since sometime in 1941, introduced a new one-piece hearing aid into the market.
(b) The one-piece hearing aid was an immediate commercial success. Its introduction had a marked effect, not only on the prosperity of Beltone, but on the hearing aid market generally. Because of its reduced size and increased con *20 venience, it accomplished what amounted to a revolution in hearing aid design.
'•(c) One other single-unit hearing aid was introduced during 1944, a few more in 1945, still more in 1946, and, by the end of 1947, all hearing aid manufacturers, including the plaintiff, were offering one-piece hearing aids.
(d) For a combination of reasons, some of which are the subject of subsequent findings, the plaintiff’s one-piece model was not ready for market until 1947. By that time, the plaintiff had been offering essentially the same two-piece hearing aid for approximately 8 years without substantial change in basic shape or weight. During that period, there was no deterioration in the quality of the Aurex instrument or in its performance, but it had not been substantially improved. When the plaintiff did offer a one-piece unit, in 1947, it encountered market resistance because many users regarded its high-frequency response as physically annoying.
(e) The plaintiff’s market deteriorated between 1944 and 1946 while it was engaged exclusively in war production. It has never since regained the position in the hearing aid industry which it held in 1944, immediately before its entry into war work and the practically simultaneous initial offering by Beltone of a one-piece hearing, aid.
(f) Beltone’s president testified that Beltone did not have the facilities to engage in any war work and Beltone did no war work. Indeed, it grew to a prominent position in the industry during the war years with the assistance of many of the plaintiff’s former local sales representatives who shifted to Beltone while the plaintiff was engaged in war work. There is no evidence that the operations of any hearing aid manufacturers, other than the plaintiff, were in any way impeded by war work.

The Development of the Aurex Solenoid

The defendant’s bomb rack difficulties
14. (a) Among the equipment used by the defendant on Navy combat aircraft, both before 1944 and thereafter, was a composite device called the Mark 51 bomb rack. Its basic function was to carry bombs under the wings of aircraft and, *21 at the direction of the aircraft’s crew (1), to release the bombs and either (a) activate the arming mechanism of each bomb so that the bomb, as it fell, wonld be readied to explode when it reached its target, or (b) prevent activation of the arming mechanism if it should be decided to jettison the bomb unarmed, or (2), if a bomb was not to be dropped, to retain it, locked against arming, in presumptively safe condition for landing of the aircraft upon its return to its base.
(b) Among the components of the Mark 51 bomb rack intended to facilitate the performance of these functions were electrical devices known as arming solenoids. Each bomb rack contained two — a nose-arming solenoid, designed to arm a fuse that would cause the bomb to explode upon contact with the target, or in proximity to it, and a tail-arming solenoid, designed to activate a delayed-action fuse that would cause the bomb to explode after it had penetrated the target.
(c) The specific function of the arming solenoids was to either secure to the bomb rack, or release from its attachment to the rack, at the plane crew’s direction, an arming wire fastened to the fuse mechanism of the bomb. The arming wire was attached to the fuse in such a manner that, as long as it remained in place in the fuse mechanism, it would lock, against rotation, a propellor-like member, the rotation of which, induced by air flow as the bomb dropped, would arm the bomb so that it would be ready to explode after it had dropped a certain distance. The purpose of securing the arming wire to the rack was to assure that it would be pulled out of the bomb when the bomb was dropped, thereby freeing the arming mechanism to rotate and so to arm the bomb. The alternative purpose of releasing the attachment of the arming wire to the rack was to assure that it would remain attached to the bomb and drop with the bomb, thereby locking the arming mechanism and preventing the bomb from arming itself as it fell.
(d) When the solenoid was energized, if it functioned properly, it projected a pin from one of its ends which locked an arming-wire retainer that held the arming wire firmly attached to the rack. When the solenoid was deenergized, if it functioned properly, a spring would retract the pin, *22 freeing the arming wire to drop with the bomb and, remaining in position in the fuse mechanism, to prevent the bomb from arming itself.
(e) To supplement the arming solenoid, some of the bomb racks had manual arming mechanisms. These were subject to various operating deficiencies.
(f) The solenoids used in the Mark 51 bomb rack before 1944 were intended for only intermittent duty. They were designed to be capable of remaining energized for a maximum of approximately 20 minutes. If they were left energized for a longer time, they were apt to overheat, burn out, and cease to function.
Sometimes, when a solenoid would burn out from overheating, the spring would retract the pin, releasing the attachment between the arming wire and the rack. Thereafter (except as the manual arming device was used), the arming wire would drop with the bomb and the arming mechanism would remain locked, preventing the arming of the bomb which, consequently, would not explode.
Other times, when a solenoid would bum out, damage from the attendant heat would cause the pin to stick and fail to retract, thereby leaving the arming wire incorrigibly fixed to the bomb rack so that, if the bomb should be detached from the rack, whether intentionally over an enemy target or accidentally in friendly territory, the arming wire would pull out of the bomb and the bomb could arm itself and explode upon impact with any object it might happen to encounter, hostile or friendly.
(g) The limited design objective of the intermittent duty solenoid was to enable the bombardier to activate the arming solenoid as the plane approached its target and to maintain the mechanism in condition to arm the bomb long enough to enable him to complete his pass over the target.
(h) In practice, this arrangement proved inadequate and unsatisfactory. As they approached and passed over enemy targets, plane crews had many duties to perform in addition to activating the bomb-arming mechanism. In order to insure that they would not forget to arm their bombs, they adopted the practice of activating the arming solenoids long before they approached the target, sometimes soon after *23 they took off, and leaving the solenoids energized throughout the flight.
(i) This practice led to a high percentage of burned-out solenoids. Bumed-out solenoids sometimes resulted in the dropping of duds, when the plunger retracted as the solenoid burned-out. When, as a result of heat damage, the solenoids stuck in the engaged position, and the plunger failed to retract, other undesirable results followed.
In case the bombs were not dropped, and the arming solenoid stuck in the engaged position, or if it did not burn out but inadvertently was not deenergized before the plane returned to its base, the plane would land with bombs that might explode in friendly territory if they became disengaged from the plane by a rough landing or by malfunction of the bomb-retaining mechanisms.
(j) Moreover, to forestall the risk of dropping duds, some crews took to tying the arming wires to the bomb racks or fastening them by some other relatively permanent means that would insure the pull-out of the arming wire from the fuse when the bomb left the rack. This practice likewise created a dangerous condition that could result in the discharge of armed bombs on a carrier deck or in some other friendly area, if bombs so rigged should be disengaged accidentally from the bomb rack.
(k) Reports from combat areas complained of the foregoing inadequacies of the intermittent duty solenoids, and of the risks engendered by their use, either of dropping unarmed bombs on enemy targets or of bringing back unused bombs in a condition that enhanced the danger of their exploding in a friendly area.
(l) Numerous reports were received of damage from bombs, not dropped on enemy targets, that exploded upon the planes’ return to base. The evidence does not specifically identify any of these incidents as caused exclusively by malfunction or misuse of the intermittent-arming solenoids, or with similar problems that were encountered with release solenoids (likewise designed for intermittent operation), the function of which was to activate mechanisms for releasing the bombs.
*24 (m) Nevertheless, the evidence is clear that, by the spring of 1944, the Navy was convinced that the solenoids then embodied in the Mark 51 bomb rack, because they were capable of functioning continuously for only a brief time without overheating and burning out, were inadequate and unsatisfactory and should be replaced by solenoids capable of functioning continuously throughout the periods required to carry out bombing missions. The difficulty of this project was aggravated by the necessity that the solenoids fit within a very limited space available for them in the Mark 51 bomb rack.
The Navy’s efforts to develop effective continuous duty solenoids
15. (a) The steps taken to develop satisfactory solenoids were closely coordinated with efforts to minimize or eliminate various other difficulties that had been encountered in the use of the Mark 51 bomb rack.
(b) In March 1944, these were only two of innumerable problems engaging the attention of the Navy. The record does not show the relative urgency or difficulty of the bomb rack problems, as compared with the difficulty of other current Naval pro j ects.
The evidence is clear, however, that by March 1944 the development of adequate arming and release solenoids for the Mark 51 bomb rack had come to be regarded, by those responsible for furnishing satisfactory equipment for delivery of bombs in combat, as a stubbornly difficult problem, and one that urgently required a solution.
(c) At that time, it had not been solved, despite months of effort by numerous persons and various corporations. These included, among others, the manufacturers of the solenoids then being used.
They included also the members of a three-man group of electrical engineers in the Besearch Division of the Navy’s Bureau of Ordnance, known as Be-l-d. Be-l-d was responsible for the design, development, manufacture, and testing of all electrical components of the Navy’s aviation ordnance equipment. Its members were the only electrical engineers in ordnance at that time.
*25 Concerned also with, the solenoid problem was a group, known as Re5f, which was responsible for design, development, and testing of bomb release equipment. Re5f contained no electrical engineers but it worked closely with Re-l-d, and relied upon Re-l-d to handle whatever electrical problems arose with respect to bomb electrical equipment.
16. (a) The evidence indicates that by March 1944 the search for a solution to the solenoid difficulty had assumed a somewhat frantic and desperate character.
(b) Reports from the Fleet had made it clear that a solenoid, hereafter called the Revision “C” solenoid, which Samp-sel Time Control, Inc., a subcontractor on the Mark 51 bomb rack, had designed and developed before July 1943 as a continuous duty solenoid to replace the inadequate earlier equipment, was itself unsatisfactory. No adequate substitute was being produced and none had been designed that offered any apparent promise of meeting the requirements.
(c) At least seven projects were afoot for correction of various deficiencies of the Mark 51 bomb rack, including one, under the direction of the Office of Scientific Research and Development (OSRD),[2] for its complete redesign. The
stated objectives of the OSRD project included correction of failure of arming and safety functions and of the release mechanism.
*26 (d) In addition to these several formal projects, an engineer named Barrett,[3] who was representing a number of Chicago concerns in Washington and being paid by one of them (Utah Eadio Products Company), while performing various services under contract with the Navy, had been, since January 1944, seeking someone who could develop and produce a satisfactory solenoid for the Mark 51 bomb rack. His efforts to induce Utah Eadio to design a suitable solenoid had been unavailing. Utah’s chief engineer had available for several months a complete bomb rack and a few samples of the solenoids that required revision but was unable to accomplish improvements in the solenoid’s performance. Whether this was because he found the problem beyond his capacity, or because he was preoccupied with numerous other urgent matters and never gave it intensive consideration, is not wholly clear from the evidence. Barrett testified that he, himself, regarded the problem as a simple one.
However this may be, late in March or early in April 1944, Barrett went again to Chicago for the purpose of getting something done about the solenoid. What he says he did about it on that trip is the subject of finding 20(d) (2).
(e) The manner of the plaintiff’s introduction to the solenoid problem is further indicative of the random search for a solution that was going on.
Sometime late in March or early in April 1944, a Lieutenant Thompson, who was a liaison officer between OSED and Ee5f, to which he was attached, was in Chicago on official business. His business included an attempt to find someone who could help overcome the solenoid difficulty. Thompson discussed this with a Mr. Dumke, a vice president of Utah Eadio. Dumke was, by that time, convinced that Utah’s engineers could not solve the difficulty. He did, however, put Lieutenant Thompson in touch with Huth, as someone he thought might be helpful.
On the same day, Thompson explained the problem to Huth at length, emphasized its urgency, and gave Huth one or more samples of the unsatisfactory solenoid. Huth told *27 Thompson he would see what he could do. He said he had no interest in a production contract and whatever he was able to do he would do as a patriotic gesture, without compensation.
The plaintiff’s part in solving the solenoid difficulty
17. (a) A few days after Thompson first talked with Huth in Chicago, Huth 'brought to the Bureau of Ordnance, in Washington, one or more handmade models of a redesigned solenoid. Tests, on simple testing equipment available at the Bureau of Ordnance, indicated that, with some changes, the design might meet the requirements.
(b) Within another few days, Aurex sent additional handmade models to Be5f. These were tested at the Naval Gun Factory with generally favorable, although not finally conclusive, results.
(c) On April 14, 1944, Huth met with personnel of Be5f and Be-l-d, in Washington, to discuss the solenoid problem further. They made various suggestions and Huth was furnished with performance criteria for continuous duty arming solenoids, prepared by one of the engineers in Ke-l-d. He was informed, orally, concerning standard Navy specifications covering operational requirements and it was suggested that the plaintiff submit a proposal for making 50 solenoids of the type Huth had presented, and furnish drawings and detailed specifications relating to such a solenoid.
(d) On May 8 and 13, 1944, the plaintiff, as requested, submitted written proposals for supplying 50 solenoids conforming with the performance specifications furnished to him on April 14. The proposal of May 8 was accompanied by a model of the solenoid.
(e) On May 23, 1944, a written contract for 50 solenoids, to be made in accordance with the plaintiff’s drawing, was entered into between the defendant and the plaintiff. The contract included an obligation of the plaintiff to furnish the Navy “with a complete set of Bureau of Ordnance drawings for record and specifications covering their manufacture.”
(f) On or about June 17, 1944, the plaintiff completed performance of the contract for 50 solenoids. Forty-four solenoids were sent to the Bureau of Ordnance. Six were *28 sent to Douglas Aircraft Company for testing in connection with certain modifications of tbe bomb rack, tben under development at Douglas, which became known as Modifications 8 and 9,[4] as distinguished from the Modification 11 (hereafter called Mod 11), in which the Aurex-designed solenoid was used.
(g) The plaintiff received $3,000 for performance of the pilot production contract for 50 solenoids. This included $500 for the ordnance drawings and detailed specifications. Of the remaining $2,500, $1,100 covered the plaintiff’s development expenses incurred before its entry into the pilot production contract.
The Revision “F” solenoid
18. At approximately the same time as the plaintiff’s work on the solenoids was beginning, a representative of Sampsel Time Control, Inc., the manufacturer of the original unsatisfactory solenoid, and of the unsatisfactory Revision “C” solenoid, conferred with two of the electrical engineers in Re-l-d and worked out another revision which was also unsuccessful. Sometime thereafter, Mr. Strocchia, one of the Re-l-d engineers, who had also worked with Huth on the Aurex design, devised some further modifications of the Sampsel design, and the resulting solenoid — known as the Revision “F” solenoid — was regarded as acceptable. It was later produced by Sampsel and was used in the Modification 8 and 9 form of the Mark 51 bomb rack, and retrofitted in earlier forms — known as Modifications 6 and 7.
The production version of the Aurex solenoid
19. Meanwhile, another solenoid, which embodied the essential features of the Aurex design, with some changes (the source of which is not disclosed by the record), was finalized for production and for use in the Mod 11 form of the Mark 51 bomb rack. This bomb rack was made by Metal Mouldings Corporation and Hoosier Cardinal Company. The plaintiff, as subcontractor to these companies, became *29 the sole supplier of the arming and release solenoids used in the Mod 11 form of the Mark 51 'bomb rack.[5]
The designers of the Anrex solenoid
20. (a) At this point, it is necessary to revert to consideration of who did what in achieving the “Aurex” solution to the solenoid problem. The record contains much evidence offered by the defendant which eventually cumulated into a massive effort to disprove its admission, in paragraphs numbered 2-7 of its Answer—
* * * that plaintiff, voluntarily and not pursuant to contract, without expectation of compensation or material reward, direct or indirect of any kind, submitted a satisfactory solenoid arrangement which met the Navy’s requirements at a critical time during World War II.
(b) Bead as a whole, the evidence clearly sustains the correctness of the defendant’s admission.
(c) Shortly after the war, during the period when plaintiff’s wartime profits were being renegotiated, the general opinion within the Navy, confirmed by the engineers in B.e-1-d who had worked on the project, was that the plaintiff had achieved a successful solution of the solenoid difficulty and had rendered a superior performance and a commendable service in devising and producing a satisfactory solenoid. The record contains no credible evidence that contradicts this opinion and the preponderant weight of the evidence sustains it.
(d) There is, however, considerable conflict in the testimony as to exactly which of the several individuals who had a part in devising and perfecting the Aurex solenoid was personally responsible for particular elements of the design that led to achievement of the desired result.
By the time the case came to trial, apparently each individual, then living, who had participated in the effort — ■ except Huth — had become convinced that he was personally responsible for the success of the Aurex solenoid.
*30 (1) At the trial, Huth’s recollection of the part he played personally in the inventive processes by which the Aurex revisions of the deficient samples were accomplished was understandably dimmed by the passage of 16 years. However, he asserted no substantial claims to personal genius or responsibility for technical aspects of the revision. He did stoutly maintain that the successful result was the product of the plaintiff corporation and of its personnel and its facilities. The evidence as a whole shows this plainly to be true.
(2) Barrett claimed that, after trying for some months, without success, to get Utah Radio to solve the solenoid problem, which he regarded as simple, he dashed off an un-dimensioned sketch of a revised solenoid sometime in March or April of 1944 and brought it out to Chicago, intending to show it to Dumke, at Utah Radio. He testified that he told Dumke that the Navy “was almost desperate to get something done.” At that time, which Barrett recalled was a Saturday, he learned that Dumke had been unable to get Utah’s engineers to do anything about the solenoid and doubted that they could. Dumke suggested, however, that they call “a friend of his down the street, Mr. Walter Huth.” [6]
According to Barrett, they learned from Huth that he had a toolmaker at Aurex named Jimmy Southward who would be available over the weekend. They went right over to the Aurex plant and showed Barrett’s sketch to Jimmy Southward. They then picked up some sample solenoids, previously sent to Utah Radio, and Jimmy Southward worked over the weekend, including Sunday, modifying the sample solenoids in accordance with Barrett’s sketch.
Barrett said that, inasmuch as he was living in Washington and had nothing else to do in Chicago over the weekend, he stayed at the Aurex plant throughout Saturday and Sunday and observed Southward’s work in making new parts or modifying parts of the sample solenoid in accordance with Barrett’s sketch. He said he gave the sketch to Southward and never saw it again. It was not offered in evidence.
*31 According to Barrett, he returned to Washington on Monday or Tuesday, following that weekend, with the sample solenoid that the Aurex toolmaker had modified in accordance with his sketch. He identified the solenoid he took back to Washington as the one which has become known as the “Aurex submission,” of which the plaintiff later made 50 samples.
Barrett testified that, after he took the solenoid sample back to Washington, he had very little further connection with the arming solenoid. He said: “* * * I just handed the sample to Commander Hostal and that was about the end of my association with it, although I had been to Aurex on several occasions when my orders brought me to Chicago, and checked up with them on how they were proceeding.”[7]
(3) Joseph Cubert, who was the chief engineer of Aurex, testified that he had done substantial work in modifying the sample Revision “C” solenoid, over a 2- or 3-week period in the spring of 1944.
According to Cubert, he first became aware of the solenoid problem through Huth, who told him there was need for a solenoid arming system that would offer less chance of error in operation than the existing type. Cubert said that Huth initially explained the particular faults of the solenoid that had been in use and that Huth’s description was subsequently corroborated by Barrett, who, according to Cubert, “explained technically the problem.”
Cubert testified that the deficiencies of the existing solenoids that were shown to him were obvious, and that he *32 personally devised the changes that resulted in the successful solution of the solenoid difficulty.
Cubert said that, in the course of his development work on the solenoid, he consulted with Barrett about a half-dozen times within a 3-week period, initially for as much as 2 hours, and thereafter, during several informal conferences, each lasting perhaps as much as 45 minutes. During these conferences, Cubert said they talked generally, as engineers and other professional experts do, about various problems, and made informal sketches to punctuate and illustrate their general conversation.
According to Cubert, Huth had already told him of the solenoid problem, before Barrett first came in about it, and had told him in advance that Barrett would be in for the first meeting.
Cubert also testified that Huth, although he had little or no part in the technical revisions of the solenoid design, followed his work closely, was pleased with the result, and reported to Cubert the favorable reaction in Washington. Cubert had no recollection of Barrett ever making any comment to him about the success of the revisions.
(4) It is apparent from the evidence that one or more of the electrical engineers in Re-l-d made some suggestions that were helpful in the design of the form of the solenoid, of which 50 samples were manufactured.
(5) Jimmy Southward had been dead for some years at the time of the trial. Accordingly, there was no opportunity for him to assert whether his part in the development of the successful revision consisted of more than a mechanic’s function performed under the direction of one or another of the engineers.
(e) The net effect of all this evidence is that the basic design of the revised solenoid ultimately produced and incorporated in the Mod 11 bomb rack was devised and developed in the Aurex plant, by Aurex personnel, using Aurex facilities — probably with the collaboration and assistance of Barrett. Regardless of whether the successful design resulted from a flash of genius that occurred to Barrett, or a cut-and-try reorientation of components by Cubert or Huth or Southward, with Barrett’s occasional advice *33 and assistance, it is clearly apparent that the plaintiff corporation bad a dominant part in development of the basic revisions that were incorporated in the “Aurex solenoid” ultimately produced by the plaintiff and used in the Mod 11 bomb rack.

The Plaintiff's Volume Production of Solenoids

The character of the plaintiff’s contract performance
21. In midsummer 1944, at the Navy’s request, the prime contractors for production of the Mod 11 bomb rack subcontracted to the plaintiff the volume production of arming solenoids to be used in that form of the bomb rack. As indicated in finding 19, this solenoid differed in detail from the prototypes originally devised and previously made in sample quantities by the plaintiff, but retained the essential features of the original Aurex design.
22. Thereafter, the plaintiff was the sole source of arming solenoids for the Mod 11 bomb rack until August 17, 1945, when its production contracts were terminated in anticipation of reduced requirements upon cessation of hostilities.
It also made a large number of release solenoids which were designed to activate the bomb-release mechanism.
23. The direct cost to the plaintiff of equipping its plant with additional machinery, tools, and other material necessary for performing its solenoid contracts was in the neighborhood of $10,000. The manufacturing operation was not extraordinarily complex or difficult and required the addition of relatively few people to the plaintiff’s production staff. Some additional space was rented on another floor of the same building. The plaintiff financed its war work from its own resources, and the proceeds from its war production contracts more than reimbursed it for whatever direct out-of-pocket costs, including development costs, it had in carrying out its obligations under such contracts.
24. Official communications from the Navy, issued within a few years after production ceased, in connection with the renegotiation of the plaintiff’s wartime profits, state that the plaintiff’s services in devising and producing the solenoids were then regarded by the Navy as an outstanding contribution to the war effort, that its product was dependable, that *34 it met all deliveries, that it was in all respects successful as a contractor, and that, in all its dealings with the Bureau of Aeronautics, it was honest and upright, and always furnished a good product. The record contains no evidence that contradicts these statements, which were made in official correspondence by responsible Naval officers. The great preponderance of the evidence confirms them. It is found that they correctly represent the facts.
The plaintiff’s reasons for undertaking solenoid production
25. (a) There is no persuasive evidence that the plaintiff sought the solenoid production contracts. Huth was reluctant to have it undertake volume production of the solenoids, when it became evident that it would be requested to do so. He anticipated that performance of such contracts would necessitate suspension of the plaintiff’s hearing aid manufacturing business at a time when its sales had recently expanded, its profits were increasing, and its apparent future opportunities were encouraging. He knew that the hearing aid industry was developing rapidly and that there was a risk to the plaintiff’s position in the industry if it should fail to keep its product abreast of technical developments.
(b) Huth was evidently aware that the defendant had the legal power to commandeer the plaintiff’s facilities but the evidence does not show that its undertaking of the solenoid contracts was induced by any specific threat or intimation that its facilities would be taken over for war production if they were not made available voluntarily.
(c) There is evidence that some general representations were made that disruptions to the plaintiff’s civilian business that might result from diverting its plant to war production would somehow be remedied after successful conclusion of the war, but there is no showing that any contractual or otherwise legally obligatory undertakings to that effect were conditions to the plaintiff’s entering into the solenoid production contracts.
(d) There is ample basis for the conclusion that, despite Huth’s original lack of interest in solenoid production contracts and his reluctance to undertake them when they were first proposed, he agreed willingly to do so once it was made *35 apparent to him that the plaintiff’s services and facilities were desired by the Navy and might be helpful in meeting its urgent need to procure satisfactory solenoids promptly, without additional misadventures of the kinds that had attended earlier efforts to get them elsewhere. Thereafter the plaintiff entered aggressively and enthusiastically into the performance of the Navy contracts.
(e) There is no support in the evidence for the defendant’s insinuations that the plaintiff sought the soienoid production contracts in 1944 as a refuge against an already apparent deterioration in its hearing aid business. The evidence makes it quite clear that, in the spring of 1944, the plaintiff was generally regarded as one of the three or four top companies in the industry, that it was financially healthy, that its product was among the best then available and was well accepted in the market, and that its sales and earnings appeared to be on the increase.
The one-piece hearing aid, introduced by Beltone later in 1944, was not yet a significant factor in the market. Judged by their results, the plaintiff’s sales and promotion practices, and its advertising policies, were adequate, competitively, in relation to policies and practices then prevalent in the hearing aid business. The plaintiff’s difficulties did not begin until later.
(f) In sum, the evidence wholly fails to show that the plaintiff’s motivation for entering war production was anything other than a genuine desire to make its services and facilities available, for a reasonable return, to meet an apparent need of the Navy in a way that would aid the war effort.
The effect of the plaintiff’s war production on its hearing aid business
26. (a) When the plaintiff commenced preparing for production of the solenoids, it quit making new hearing aids. At that time it had a substantial inventory of the two-piece models it had been making. Accordingly, it was in a position to meet the demand for such instruments for a considerable period. Apparently it met that demand as long as it continued without exhausting its inventory.
(b) It did, however, suffer some inventory loss through the obsolescence of components which were subject to deteri *36 oration after a limited period, and on which, the guarantees by the suppliers expired during the time while the plaintiff’s hearing aid business was subordinated to its war work and it was making no new hearing aids.
(c) The plaintiff continued to perform various repair and service functions essential to keeping instruments, already sold, in repair and operable. Indeed, the amount of such work done at the factory increased substantially after war production commenced because of a decrease in the fulfillment of service and repair obligations by local sales representatives whose numbers declined for various reasons, including, among others, diversion of personnel to military service or civilian war work, the unavailability of improved Aurex instruments comparable to the one-piece units first introduced on the market at about the time the plaintiff entered into war work, and the initiation of aggressive sales programs by competitors. The plaintiff considered the performance of such functions requisite, not only to preserve its commercial goodwill as well as it could in the circumstances, but because many of the outstanding instruments were in the hands of persons who required hearing aids to maintain their effectiveness in performing war work.
27. As long as it was engaged in production of the solenoids, the plaintiff made no effort to develop improvements in its hearing aids. The fact that one-piece hearing aids were being aggressively sold by the plaintiff’s competitors and enthusiastically accepted by the market was discussed with Huth by members of the plaintiff’s staff. They inquired whether Aurex should not develop a one-piece unit to meet this new competitive product, and some of them urged that this be done. To these suggestions, Huth replied that the development of new products, as well as the manufacture of additional hearing aids for sale, would have to await completion of the plaintiff’s war contracts, and that is the course the plaintiff followed.
28. (a) The record does not definitely show whether this was the only course the plaintiff could have followed once it had committed itself to undertake solenoid production.
*37 (b) There is no specific evidence, however, that the plaintiff’s physical facilities, which were not elaborate, or its managerial and engineering personnel which consisted of only a few individuals, were adequate to enable it to continue the development and production of hearing aids on a competitive basis and at the same time perform the solenoid production contracts in the exemplary manner it did perform them by devoting substantially all its resources to them. Nor is there evidence that it could have done so with the aid of any supplemental financial assistance it might have procured from the defendant to facilitate the war contracts.
(c) On the other hand, there is no evidence, nor could there be, to show whether, if the plaintiff had been able to continue development, manufacture, and sale of hearing aids while it was performing the solenoid contracts, it would have been able to maintain or improve its relative position in the hearing aid industry. Obviously its opportunity to do so would have been improved but the success of the effort would have been subject to all the contingencies appurtenant to any competitive business enterprise.
(d) Similarly, the evidence does not show whether, if the plaintiff had concluded, as Beltone did, that its facilities were inadequate to perform war work, and if, like Beltone, it had continued the development, production, and sale of hearing aids uninterrupted throughout 1944 and 1945, without diverting any of its resources to war work, it would have been able to prevent the loss of its sales outlets that occurred during those years, and would have retained its position in the industry, or achieved, as Beltone did, a rapid increase in its sales during the years between 1944 and 1947.[8]
Here again, its opportunity to do so would not have been foreclosed, as it was by the plaintiff’s exclusive concentration on solenoid production, but the course its business might have followed in these years, if it had not entered war work, depends upon many conjectural contingencies that this record does not, and could not, resolve.
*38 29. The evidence shows only that the plaintiff chose to devote substantially all of its resources to war production during part of 1944 and the first 8 months of 1945 and to suspend all hearing aid manufacture and development while it was engaged in war production; that, in doing so, it established a war production record highly commended by the Navy and made very substantial profits from its solenoid production contracts; but that while it was engaged in war production, its sales organization deteriorated, its hearing aid sales fell off, and its profits from its hearing aid business declined, and that when its war contracts were terminated, its product for the civilian market was outdated and it was faced with the prospect and the problems of devising an acceptably improved product, competitive with other new, improved instruments already widely accepted in the market, and of rehabilitating its sales organization and regaining as much business as it could in the face of aggressive competition, some of which was new and had achieved a prominent position in the industry during the relatively brief period while the plaintiff was engaged in war production.

The Plaintiff’s Situation When Its War Contracts Ended

30. (a) As of March 31, 1946, the end of the fiscal year during which its war contracts ended, the plaintiff had substantial financial resources. Its balance sheet then was as follows:

Assets

Current Assets:
Cash._$297,108.17
Receivables (net)- 267,602.23
Inventories_ 84,152.71
Total Current Assets_ 648, 863.11
Fixed and Other Assets:
Depreciable Assets (net)- 20,702.58
Patents_ 14, 999. 99
Prepaid Expenses_ 4, 898.40
Total Assets_ 689,464. 08

*39
LicMlities

Current Liabilities:
Accounts & Notes Payable_ $16, 008. 73
Accrued Interest, Taxes, Wages & Advertising_ 7,321. 75
Reserve for profit on Inventory_ 3, 862. 80
Total Current Liabilities_ 27,193.28
Other Liabilities:
Reserve for Contract Guarantee_ 15, 000. 00
Reserve for Federal Taxes_ 166, 972.39
Capital and Net Worth:
Preferred Stock_ 64, 000.00
Common Stock_ 36, 000. 00
Surplus- 380,298.41
Total Liabilities and Capital_ 689,464. 08
According to plaintiff’s books, its working capital was $621,669.83 in comparison with $181,590.37, as of the fiscal year that preceded its involvement in the war contracts, and its ratio of current assets to current liabilities was 23.86 to 1, as compared with 2.81 to 1, before it undertook the war contracts.
(b) The profits the plaintiff had realized on its solenoid production had ostensibly enhanced its equity cushion and its working capital and contributed substantially to its apparent financial well-being at the war’s end. In view of the contingent prospect of renegotiation of its wartime profits, however, it could not be certain how much of its resources attributable to that source would remain available for use in its civilian business, either as corporate cash or as a basis for credit.[9]
(c) Even taking account of the renegotiation contingency, the plaintiff appeared to be in the best condition in its history, financially, a few months after the termination of its solenoid contracts. The weakness of its position lay not in a lack of *40 financial resources but in (1) the fact that its sales organization had atrophied during the time when it had been out of active competition in the hearing aid market, while revolutionary advances were occurring not only in the form of hearing aids being sold but in techniques of hearing aid advertising and sales promotion, and (2) the fact that its available product was commercially obsolete and it had no new model ready to replace it that could compete effectively with the new one-piece units that had become popular.
(d) These latter conditions were direct consequences of the plaintiff’s having devoted its facilities and energies to the performance of its wartime contracts to a degree that had precluded it, for about a year and a half, from efforts to preserve and protect its position in the hearing aid industry. In this sense they were directly attributable to its war production activities.

The Course of the Plaintiff's Business After the War

31. (a) Starting from this position, the plaintiff set about to attempt to reestablish its civilian business. Its efforts were frustrated by a combination of circumstances. Insofar as the record discloses them, these circumstances are the subject of succeeding findings, which attempt to identify the maimer and the relative extent to which the subsequent history of the plaintiff’s business was affected by its own business policies and decisions, by business misfortunes for which neither the plaintiff nor the defendant was primarily responsible, and by the renegotiation of its wartime profits.
(b) The history of the plaintiff’s business in the years immediately after the war reveals a rapid decline in its financial resources from the high point of March 1946. The evidence does not show in detail the nature of all its operations during the first years after the war. Whatever they were, they caused its expenditures to outstrip its income. There is evidence that they included, as a major project, the development of a new one-piece hearing aid, and it is a reasonable inference that this activity cost the plaintiff much more, at the outset at least, than it returned in earnings.
*41 (c)Between 1946 and 1949, the plaintiff’s working capital and cash declined as indicated in the following table:
Fiscal year: capital equivalent
1944... $238,820 $21,379
1945_ 428,114 98,911
1946_ 621,670 297,108
1947_ 315,728 121,057
1948_ 74,685 1,058
1949_ 24,708 2,925
(d)Its net profits or losses after income taxes during these years (excluding any renegotiation assessment in 1946) were as follows:
1946_$275,695
1947_ (185,678)
1948- (192,035)
1949- ( 78,391)
(e) The annual balance sheets do not reflect any renegotiation liability until 1948, when $114,118.07 was first included as a current liability. This item was carried forward, unchanged, into the 1949 balance sheet.
(f) Obviously the expenditures made by the plaintiff in carrying on its business during 1946 and 1947, which depleted its resources during those years, are not attributable to the renegotiation.
The evidence does not affirmatively show how much the plaintiff spent on efforts to reestablish its sales organization, how much on the design of the new hearing aid, or how much for other activities.
Development expense for the new model was a cost the plaintiff would have had to incur in any event, preferably earlier than it did, in order to provide itself with a product capable of competing in the changed market that had resulted from the introduction and general acceptance of one-piece hearing aids.
32. (a) The plaintiff introduced its new one-piece hearing aid in 1947. The general implication of the somewhat limited evidence is that it was a commercial disaster, largely for technical reasons.
(b) Cubert testified that he and Huth differed as to the frequency range that should be designed into the new model. Huth thought it should reproduce frequencies as high as *42 ten or eleven thousand cycles. Cubert thought it should be limited to frequencies not exceeding 5,000 cycles. According to Cubert, he thought sounds in the high ranges would be disturbing and irritating to people with impaired hearing, lacking experience with such sounds, whereas Huth believed that, although the instrument’s reproduction of high frequency sounds might bother users at first, they would soon become accustomed to it, and the wider range ultimately would be regarded as advantageous. Which was right, from the viewpoint of potential overall benefit to persons with impaired hearing, is irrelevant to the issues in this case. The significant facts apparent from the record are, that when the new model was offered for sale in 1947, it was not widely accepted by customers and, that some, at least, of the Aurex dealers who had hung on during the period when Aurex was engaged in war work and was developing its new unit, concluded that the new hearing aid would not sell, and abandoned their Aurex representation.
(c) Aurex also had trouble with unsatisfactory components furnished by one of its suppliers for use in the new hearing aid. These difficulties contributed to its commercial unacceptability.
(d) In addition, there is some evidence that Huth was reluctant to agree that Aurex should provide instruments molded of flesh-colored plastic. Cubert quoted him as paraphrasing the comment about the Model “T,” widely attributed to Henry Ford, that they could have it in any color they wished as long as it was black. Although Cubert was not quite sure this was not intended as a humorous remark, apparently Aurex did delay furnishing flesh-colored earpieces, after the public had come to prefer them, and may have lost some sales as a consequence.
(e) The aggregate result of these engineering and business decisions and occurrences was that, when the new Aurex one-piece hearing aid was offered, it was not commercially successful. The cost of making changes and providing for adjustments designed to ameliorate the objections, and overcome the market resistance to it, compounded the financial *43 stringency which, by 1947, had begun to afflict the plaintiff.[10]
(f) The direct financial consequences of the development and the commercial failure of the new model in 1947 are not attributable to either the plaintiff’s war work or to the renegotiation of its war profits. They were the result of technical judgments as to what type of instrument would be generally acceptable to ordinary users of hearing aids who bought their instruments direct from dealers, rather than on doctors’ prescriptions, and to technical problems with components furnished to the plaintiff by makers of microphones and other parts.
(g) By the time the difficulties with the new model occurred, problems arising out of the renegotiation of plaintiff’s wartime profits had also begun to affect its financial situation.
The findings which follow summarize the course and the basis of the renegotiation, the steps the defendant took in an effort to collect the asserted renegotiation liability, the plaintiff’s efforts to meet or to avoid that liability, and the effect of the liability on the plaintiff’s efforts at reconversion.

Renegotiation Standards Prescribed by Statute and* Regulation

33. (a) The Renegotiation Act of 1942, 50 App. U.S.C., § 1191, provided in part (§ 1191(a) (4) (A)) :
The term “excessive profits” means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this section to be excessive. In determining excessive profits there shall be taken into consideration the following factors:
(i) efficiency of contractor, with particular regard to attainment of quantity and quality production, reduction of costs and economy in the use of materials, facilities, and manpower;
*44 (ii) reasonableness of costs and profits, witfi particular regard to volume of production, normal pre-war earnings, and comparison of war and peacetime products;
(iii) amount and source of public and private capital employed and net worth;
(iv) extent of risk assumed, including the risk incident to reasonable pricing policies;
(v) nature and extent of contribution to the war effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;
(vi) character of business, including complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover;
(vii) such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.
(b) The regulations of the Board under the Act (9 Fed. Reg. 6154) provided in part as follows:
$ $ $ $ $
413.1(b),(6) Where the entry of a contractor into war business involved physical and other adjustments which will create substantial problems in a reconversion to prewar business such as possible loss on capital investments made for war production purposes, loss or saturation of markets or other similar problems, the increased risk incident to such contractor’s entry into war business as compared with other contractors who do not have similar risks is to be given consideration. [RR 413.2]
‡
414.1 (b) Consideration is to be given to the nature and extent of the contractor’s contribution to the war effort. Favorable consideration for unusual contributions should begin at a high level of performance. Experimental and developmental work of high value to the war effort, and new inventions, techniques and processes of unusual merit are examples of special contributions. * * * [RR 414.2]
Í ‡ ‡
415.1(b) (1) Consideration is to be given to the character of the business of the contractor. The manufacturing contribution will vary with the nature of the product and the degree of skill and precision required in the work performed by the contractor. * * *
*45 (2) Maximum war production, and tbe policy of Congress require that subcontracting be used to the maximum extent practicable. A contractor who, through subcontracting, materially increased the volume of war production in addition to making full use of his own plant and facilities, has shown ingenuity and resourcefulness in making use of the facilities of small plants, has assisted with engineering and production advice and has devoted time and managerial ability to such subcontractors should be considered as having made a greater contribution than one who has merely subcontracted certain parts of his production requirements. The contribution made by a contractor with respect to organizing the volume of his business produced by subcontractors varies substantially and must be evaluated in each instance. [EE 415.2]
:ji % ij:
(c) The regulations (§ 1608.381, & Fed. Eeg. 6170 (1944)) further provided:
‡ ‡
(1) Profit. The term “profits derived from contracts with the departments and subcontracts” is defined by the act as the excess of the amount received or accrued under contracts and subcontracts over the costs paid or incurred with respect thereto. The term “costs” includes selling, general and administrative expenses. Such profits will be determined with respect to the aggregate of the amounts received or accrued under all contracts and subcontracts for the taxable year of the contractor on either the cash or the accrual basis, according to the method by which the contractor keeps his books, and will not be determined on a contract-by-contract basis unless the contractor so requests and the Department conducting the renegotiation consents.
(2) Allocation of cost. ' In general the costs paid or incurred with respect to renegotiable contracts will be those costs allocated thereto by the contractor’s established cost accounting method if that method reflects recognized accounting principles and practices. If, in the opinion of the War Contracts Board there is no adequate or effective cost accounting method in use, or if the method employed does not properly reflect such costs because there are unjustified or improper allocations of items of cost in the accounting records or in the reports or statements filed for the purpose of renegotiation, costs shall be determined in accordance with such method as *46 in the opinion of the Board properly reflects such costs. No item of cost shall be charged to any contract or subcontract or used in any manner in determining costs to the extent that such item is not properly chargeable to such contracts or subcontracts.
Conversion to war production § 1603.384, 9 Fed. Beg. 6173 (1944).
Conversion to toar production. The full amount of costs of converting facilities to war production which do not represent permanent additions, such as rearrangement of machinery, is allowed by the Bureau, and will be allowed in renegotiation, for the year in which it is incurred to the extent allocable to renegotiable business. This does not include losses on commercial inventory which has become unsalable as a result of wartime regulations or loss of market, for such losses are not properly allocable to renegotiable business. [NR 384]
§ 1603.385 Losses — (a) Costs or losses on non-war ventures. Losses and costs incurred in connection with business activities or ventures not connected with renegotiable business will be charged against such business activities or ventures and not to renegotiable business. [RR 385.1]

History of the Renegotiation

34. The plaintiff was informed, by a letter dated October 19,1945, that a representative of the Navy Price Adjustment Board would visit its plant on November 15,1945, to expedite its renegotiation.
3,5. By a letter dated November 16,1945, immediately after this first visit, the plaintiff requested an extension of time of from 60 to 90 days to prepare the necessary data. Nothing more occurred until June 5,1946.
36. On June 5, 1946, the plaintiff was informed by letter that a Board representative was being sent to the plaintiff’s plant who was —
* * * authorized to confer with the proper officials of your company with respect to the excessive profits, if any, which have been realized on your business subject to the statute for the fiscal year ended 3/31/46 & 3-mos. end. 3/31/45 with a view to arriving at a mutually satisfactory determination of the amount of such excessive profits, if any.
*47 This procedure has been adopted in your case because it is felt that your renegotiation can probably be handled satisfactorily without the necessity of requiring you to appear before the Navy Price Adjustment Board. If, however, you prefer to present your case directly to the Board, please wire or call the undersigned immediately in order that our representative may revise his itinerary. In such event, the date of 15 July 1946, has tentatively been set for a hearing before the Board, as indicated by the notice of the commencement of renegotiation proceedings which is enclosed.
* * * *
If your dealings with our representative are unsatisfactory in any respect, you may appear before the Board at the time and place fixed in the enclosed notice to present your views and arguments. Kindly advise the undersigned immediately after the visit of our representative if you desire to appear for such hearing.
37. (a) On June 17, 1946, Mr. Harry Christenat, a representative of the Board, performed a 1-day field audit of the plaintiff’s renegotiation liability. He was accompanied by an accountant, Lt. K. F. Hall. They studied the plaintiff’s records, conferred with Huth and others of the plaintiff’s personnel, and with Lieutenant Thompson who, by that time, was a Commander, and who made various representations to the Board’s representatives concerning the plaintiff’s contribution to the war effort.
(b) Christenat concluded and reported to the Board that the plaintiff’s profits on what he regarded as renegotiable business were excessive to the extent of $70,000 — $58,000 for the period January 1, 1945, through March 31, 1945, and $12,000 for the period April 1, 1945, through March 31, 1946.[11]
(c) On the basis of Christenat’s determination, the plaintiff’s net renegotiation liability would have amounted to *48 about $28,000, after deducting income and excess profits taxes previously paid by the plaintiff on tbe amount thus determined to be excessive.
(d) In arriving at the figure of $70,000 for a total refund, Christenat had allocated to renegotiable business, certain costs related to the hearing aid business, the exact amount of which is not wholly clear from his report.[12] These costs probably included items, designated in the minutes of later meetings of the Board as “repair labor costs,” along with some part, or possibly all, of certain sales and company office expenses, and patent amortization charges, totaling $131,468, which were later considered by the Board under the comprehensive title, “Sales and Commission Expense,” and disallowed.
Such of these items as Christenat allocated to renegotiable business he understood to be costs incurred by the plaintiff during the period covered by the renegotiation in rendering services, making repairs, and performing related functions which were unfulfilled obligations of local dealers. This expense Christenat attributed to renegotiable business on the theory that the failure of dealers to perform such functions resulted from the plaintiff’s inability to furnish them with salable instruments while it was engaged in war production, and that, as a consequence, the plaintiff’s direct assumption of these costs was attributable to its concentration on its war contracts.
In part, his determination that salable instruments were not furnished the dealers was premised on his impression that the plaintiff did not have adequate production facilities to continue manufacturing its commercial product at the same time it was manufacturing the articles called for by the solenoid contract.
(e) Christenat also allocated to renegotiable business about $60,000 as an inventory adjustment for losses on perishable hearing aid components that could no longer be used *49 after the war’s end, either because they had deteriorated during the period when the plaintiff was not making new hearing aids or because the supplier’s guaranty had expired during that period, or both.
(f) Although Christenat’s report refers to $98,019.79 as expended for developmental expense in connection with the bomb release and arming solenoid, the amount he allowed for it was $94,782 — $23,660.26 for 3 months in 1945 and $71,121.95 for the year ending March 31,1946.[18]
(g) Christenat’s report states that information was developed concerning the following matters which he understood the Board was directed by the applicable statute and regulations to consider:
(1) The character of the plaintiff’s business ;
(2Í The plaintiff’s efficiency;
(3) The reasonableness of the plaintiff’s costs and profits;
(4) The risks of the plaintiff’s business — including particularly the fact that the plaintiff:
“Sacrificed commercial business in deference to war work. Competitors have produced new models during war period. Aurex must start from scratch and develops [sic] new and modem products.”
(5) The fact that all facilities and capital were furnished by the plaintiff, and
(6) The plaintiff’s development of the solenoid, and its cooperation.
38. Although the plaintiff’s management was not convinced that it was properly subject to any renegotiation liability, it agreed to accept Christenat’s determination and was under the impression that the matter was settled.
39. (a) The Navy Price Adjustment Board, on the other hand, did not accept Ghristenat’s determination.
(b) In August 1946, the Chief of the Field Renegotiation Section of the Board wrote the plaintiff that Christenat’s suggested refund had been reviewed by a panel of the Board which had determined that the Board could not allow any portion of two expense items designated, “Expense of main *50 taining dealerships” and “Commissions,” which Christenat had allocated to renegotiable business.[14]
A revised computation, transferring the disallowed items from renegotiable business to nonrenegotiable business, accompanied the Board’s letter which stated:
You will observe that this revision in the allocation of expenses increases the gross refund from $70,000, as originally proposed, to $150,000. Originally $58,000 was proposed for the period from 1 January 1945 through 31 March 1945 and $12,000 for the period from 31 March 1945 to 31 March 1946. For both periods the refund has been increased to $75,000 each, for a total of $150,000.
The Board requested the plaintiff’s acceptance or refusal of the revised refund figures by September 10, and transmitted, for execution, an agreement extending the time for completing the renegotiation to March 31, 1947.
(c) The plaintiff did not acquiesce in the proposed revision of Christenat’s determinations and, in September 1946, arrangements were initiated for conferences, in Washington, to inquire further into the amount of plaintiff’s renegotiation liability.
40. (a) Meetings were held between the plaintiff and the Board on October 10,1946, and November 21,1946, at which the Board reached no decision but requested additional information. The Board disagreed with some of the plaintiff’s accounting methods, particularly its method of allocating items between renegotiable and nonrenegotiable business, but the plaintiff made its records freely available to the Board’s representatives and whatever confusion was attributable to the plaintiff’s bookkeeping methods was dispelled.
(b) On June 9 and 10, 1947, there were further meetings between the plaintiff’s representatives and the Board. Mr. Edwin FI. Barker, as Chairman of the Board, presided over these meetings. Christenat was present, apparently, according to the minutes, as a member of the Board pane].
*51 41. (a) At the end of the meetings in June 1947, the Board concluded that a total renegotiation refund of $240,000 was due from the plaintiff — $60,000 for the 3-month period January 1, 1945, through March 31, 1945, and $180,000 for the period April 1, 1945, through March 31, 1946.[15]
(b) The minutes of the Board meetings report a statement by Barker, during the meeting, that a credit of $150,000 had been allowed for the plaintiff’s contribution to the war effort, but it is impossible to discover from any of the evidence the manner in which this purported credit was computed, or how it was reflected as a tangible allowance in the fixing of the amount of the renegotiation liability.
(c) The minutes of the Board’s meetings show that the Board was informed concerning the nature of the plaintiff’s war contracts, and of its development of the “Aurex” solenoid, and that it was told that the plaintiff had ceased to develop or manufacture new hearing aids when it entered into war production, that it had financed development and production of the solenoids with its own capital, that its dealer organization had disintegrated during the period when it was engaged in war work, that it spent substantial amounts servicing and repairing hearing aids in order to fulfill warranties given by its independent distributors, many of whom had abandoned its representation during the period when its manufacturing facilities were engaged solely in solenoid production, and that it had incurred an inventory loss approximating $60,000, represented by perishable components that were available but unused in the manufacture of new hearing aids while it was doing war work. The minutes indicate that the Board was told that these latter items would not have been in the inventory except for the war and that this inventory loss had been allowed for tax purposes by the Bureau of Internal Bevenue.
The Board was also informed that high priorities were available for the manufacture of hearing aids, so that the *52 plaintiff could have continued to develop and manufacture hearing aids had it not been for its solenoid contracts, but that it could not have set up a separate organization to handle the solenoid contracts.
(d) The Board agreed to allow $94,782 development cost of the solenoids as an expense of renegotiable business.
(e) In determining the operating profit on renegotiable business, the Board disallowed a total of $131,468 which apparently the plaintiff had sought to have allocated as a cost of renegotiable business under the general title of “Sales and commission expense.” This amount consisted of the following items:
Bepair Babor_$34,178
Patent Amortization_ 3, 016
Zone Managers- 19, 767
Salesmen’s Salaries- 19,079
Maintenance of Company Offices- 47,127
Other Selling Expense- 8,301
131,468
(f) The Board also disallowed the $60,000 inventory adjustment claimed by virtue of the obsolescence of perishable components, guarantees on which had expired during the period when the plaintiff was engaged in solenoid production.
(g) Except for the allowance of the development costs, and the disallowances described in findings 41 (e) and (f), the Board’s minutes do not show how the Board arrived at its determination that $240,000 was the amount by which the plaintiff’s wartime profits were excessive.
(h) The minutes do not show what consideration, if any, the Board gave to the various representations made to it concerning the nature, the extent, or the effect on the plaintiff’s civilian market, or on its reconversion, of the plaintiff’s participation in the war effort, or what impact such consideration as it gave to these matters had on its decision.
(i) Nor do the minutes show any specific basis for the Board’s implied determination that, except for the $150,000 credit Barker said had been allowed for the plaintiff’s contribution to the war effort, its renegotiation liability would have been $390,000 ($240,000+$150,000).
*53 There is no evidence, for example, which shows that the plaintiff’s operating profit on renegotiable business could have been found to be $681,809 ($531,809+$150,000), except for some unidentified (and, on this record, unidentifiable) reallocation by the Board of earnings or expenses between renegotiable and nonrenegotiable business so as to reduce the operating profit to the $531,809 figure the Board used. Nor is there evidence that the Board’s finally computed normal profit of $291,809 ($531,809 — $240,000), for these two periods, was $150,000 more than the plaintiff could reasonably have expected to earn for the appropriate part of these 2 fiscal years.
If the Board had fixed the plaintiff’s renegotiation liability at $390,000 ($240,000 assessed plus the $150,000 said to have been allowed as a credit) and applied that determination to the figures the Board used as representing the plaintiff’s operating profit on renegotiable business, the plaintiff’s net operating profit, after satisfying the renegotiation liability, would have been about $141,000 on renegotiable business, and (after deducting the loss of $42,541 the Board found on nonrenegotiable business) about $99,000 on all business. Taking account of the rate at which the plaintiff was making profits on its hearing aid business at the time it entered war production, this would appear to have been an unconscionable reduction.
(j) The plaintiff’s attorney stated, at the conclusion of the June 1947 meeting, that the plaintiff would have difficulty in paying the refund because of its restricted cash position. Barker requested that the plaintiff notify him of its decision with respect to the proposed refund by June 23,1947.
42. (a) In the course of discussions between the plaintiff, its representatives, and Barker, concerning arrangements for payment of the renegotiation liability, Barker expressed sympathy with the plaintiff’s problems and a willingness to do what he felt he properly could to aid their solution, but said the Board had no alternative under the law and the regulations but to make the determination it had made.
(b) Among the matters discussed with Barker was the prospect that, even if the plaintiff should ultimately be successful in disputing the Board’s determination through pro *54 ceedings for review in the Tax Court, it would probably be bankrupt and its business would be liquidated before it could achieve a remedy by such proceedings, in view of the crowded nature of the Tax Court docket, and the lack, at that time, of any provision for a stay of collection efforts while such proceedings were pending there.
(c) The possibility of a loan from the Eeconstruction Finance Corporation to assist the plaintiff in meeting the renegotiation liability was also discussed. Barker said he would communicate with the NFC on the plaintiff’s behalf. This he subsequently did, making representations favorable to the plaintiff in connection with an application by the plaintiff for a loan of $100,000 from the KFC which was denied, despite Barker’s intervention, first, in December 1947, and again, after being renewed, in February of 1948.[16]
(d) There were also discussions of the possibility that proceeds from additional contracts with the Navy might provide funds to pay the plaintiff’s renegotiation liability, and, late in July 1947, Barker inquired of the Navy concerning the prospect of the plaintiff’s providing services to the Navy, within the succeeding year or two, on projects that might produce income which, when added to income from the plaintiff’s hearing aid business, might enable it to meet its renegotiation responsibilities. According to the text of his communication, Barker made these inquiries in an effort to determine whether he might be justified in extending the time for payment of the plaintiff’s renegotiation liability to enable it to realize income to satisfy that liability, meanwhile keeping the plaintiff available to perform contracting services for the Navy, which regarded it highly as a source of products within its manufacturing competence.
43. The plaintiff’s management, discouraged by the evident difficulties of meeting the renegotiation liability established by the Board’s determination, and of keeping its operations going while contesting that determination through proceedings in the Tax Court, entered into two agreements with *55 the defendant, dated September 22, 1947, providing for payment of the renegotiation liabilities of $60,000 and $180,000, in specified installments.
44. (a) The renegotiation agreements each provided that the amount of the decrease in plaintiff’s tases for the years when the renegotiated profits were earned, which would result from the agreed refund of excess profits, would be allowed as a credit against the renegotiation liability.
(b) The net amount of the renegotiation liability asserted against the plaintiff was $114,118.07, after subtraction of the tax credit provided in the agreements.[17]
(c) The plaintiff’s balance sheet as of March 31, 1948, shows $114,118.07 as a current liability under the designation, “Due on renegotiations.” The evidence does not show precisely when this liability was first set up on the plaintiff’s books, but it is a reasonable inference that, from the time the Board determined in June 1947 that the plaintiff was obligated to refund $240,000 of its war profits, if not before, its renegotiation liability was an added adverse factor in all of its dealings with existing or potential creditors.
45. On April 21,1948, the plaintiff was notified that it was delinquent in its payments due under the renegotiation agreements. It was given a 30-day extension in which to make the first payment.
46. (a) On June 10, 1948, no payment having been made, the case was referred to the Department of Justice and the plaintiff was so informed on June 21, 1948.
(b) Thereafter, the defendant filed suit in Federal court, in Chicago, to collect the amounts it claimed to be due under the agreements. The suit had the effect of making it necessary for the plaintiff to pay cash in advance for all materials and supplies.
47. Following extended negotiations, the plaintiff submitted to the Department of Justice an offer to compromise its renegotiation liability for $1,000 which was rejected on J anuary 27,1950.
*56 48. On October 9, 1950, the plaintiff made a written offer to pay $5,000 in full settlement of its renegotiation liability, which stated:
This offer reserves the right of Aurex Corporation to seek relief through Congressional action.
The offer was accepted and the settlement was accomplished, in October 1951, on the basis proposed.
49. In perfecting the settlement, the plaintiff executed and delivered to the defendant a release, accompanied by a transmittal letter which stated:
The release recites an indebtedness for excessive profits. For the purpose of this compromise those facts are assumed. The offer of Aurex Corporation, as well as discussions with your officials, recognize the right of Aurex Corporation to seek relief from the determination of excessive profits by congressional action.
In the event such relief is sought, Aurex Corporation will establish that they were neither in fact nor in law excessive profits such as determined to be due. This will, however, in no way involve any contest or raise any doubt concerning the legal and binding nature of the offer, its acceptance, or the enclosed release.

The Basis of the Renegotiation

50. (a) The minutes of the Board’s June 1947 meetings, as well as other evidence, show that the Board, and those of its employees who took part in the renegotiation proceedings, were informed about the quality of the plaintiff’s war production record, the risk of detriment to its civilian business and of reconversion difficulties which it incurred by concentrating on solenoid production, and the fact that by 1947 those risks had matured into a condition of acute financial distress.
(b) The minutes show little, if anything, about the nature or extent of any consideration the Board gave to those factors, and nothing about the way in which it purported to translate its consideration of such factors into any adjustment of the amount it found otherwise to be excessive profit on renegotiable business.
*57 51. (a) Barker’s testimony is more revealing, although it is somewhat obscure because the precision of his recollection was evidently impaired, partly by the passage of time and partly by his aggressively defensive attitude with regard to the correctness of his decision.[18]
(b) Barker claimed that, in reaching a final judgment as to what profits were excessive, he was the Board and that the other nominal members were merely aides whose duty it was to see that he was not overlooking anything.
(c) He made it clear that, in determining how much of the plaintiff’s profit was “excessive,” he considered only the direct and immediate impact of the plaintiff’s solenoid production on its earnings and its assets, and only risks directly related to the war production itself. He stated that he regarded, as beyond his official concern, any effect the plaintiff’s concentration on war production might have had on its civilian business. In reliance on this understanding of his responsibilities, he apparently gave no consideration to the plaintiff’s normal prewar earnings, no consideration to the risk of loss or impairment of the plaintiff’s civilian market incident to its entry into war production, and no *58 consideration to the risk of reconversion problems created by the plaintiff’s suspension of development and manufacture of its civilian product. The statute and the regulations plainly directed that he do so.
(d) In this respect, Barker’s approach to the renegotiation appears to have ignored particularly the following provisions of the statute and the regulations:
(1) Sec. 1191(a)(4)(A) of the Renegotiation Act, which directs that:
* * * In determining excessive profits there shall be taken into consideration the following factors:
* * * * *
(ii) reasonableness of costs and profits, with particular regard to * * *, normal pre-war earnings, and comparison of war and peacetime products;
$ * * $ #
(2) Paragraph 413.1 (b) (6) of the applicable regulations which provides:
Where the entry of a contractor into war business involved * * * adjustments which will create substantial problems in a reconversion to pre-war business such as possible * * * loss * * * of markets or other similar problems, the increased risk incident to such contractor’s entry into war business as compared with other contractors who do not have similar risks is to be given consideration.
52. (a) The Board disallowed the plaintiff’s claim that amounts totaling $131,468, said to have been spent in efforts to maintain field offices and service functions in the face of dealers’ wartime defections and defaults, should be treated as expenses of renegotiable business.
(b) The particular ground on which Barker said he based this disallowance appears to be applicable to only a part of the expenditures. Taking account of the basis asserted for the claim, however, it is impossible to find from-the evidence that its disallowance was erroneous. The reasons are summarized immediately hereafter.
(1) Barker did not attribute any of these expenses to a loss of local dealers caused by the plaintiff’s inability to furnish salable hearing aids while it was engaged in war pro *59 duction. Indeed, be said be was not informed that the plaintiff had ceased development and manufacture of new hearing aids. He said he was told only that some dealers who were jewelers had abandoned their dealerships to take jobs in war industries requiring precision work. This he regarded, correctly, as a consequence of the war, but not of the plaintiff’s concentration on war production.
(2) It is a reasonable inference from the evidence that some dealers were lost to civilian war work, as Barker assumed. Common experience suggests that some were also lost to military service, and some for other reasons that likewise had little or nothing to do with the fact that the plaintiff was unable to furnish its dealers with new one-piece hearing aids while it was engaged in war production. On the other hand, it is clear from the evidence that, beginning in 1945 at least, some dealers were lost because Aurex was not developing or producing instruments, competitive with the new one-piece hearing aids offered by its competitors, and that some were lured away by competitors who had modernized their products while the plaintiff was busy making solenoids. It is clear also that this latter information was available to the Board.
(3) The evidence in this record does not show, however, what part of the plaintiff’s total cost of performing necessary service and repair functions which dealers had failed to perform was attributable to a lack of salable instruments caused by its concentration on war production and what part was attributable to dealer defections induced by other causes, not related to the plaintiff’s war work. Nor does it appear that the Board could have identified the parts of the costs attributable to each of these several causes on the basis of the information furnished to it by the plaintiff, even if Barker would have considered any of such costs proper deductions from negotiable business, which appears unlikely.
(4) In the absence of evidence to show what part of these costs was attributable to a lack of salable instruments caused by the plaintiff’s concentration on war production, the record affords no adequate basis for finding, even on the plaintiff’s *60 view of the applicable law, that the Board was wrong in disallowing, as “Sales and commission expense,” the entire $131,468 which the plaintiff apparently had sought to have allocated as an expense of its solenoid production.
53. (a) The Board also disallowed $60,000 of inventory loss which the plaintiff sought to have allocated to renegotiable business. This loss related to perishable parts which the plaintiff had but did not use in making new hearing aids during the time while civilian production was suspended and on which the suppliers’ guarantees expired, rendering them unusable thereafter.
(b) When it entered war production, the plaintiff had an inventory of its latest model, two-piece hearing aids that fully met the demand for that type of hearing aid while it was engaged in making solenoids. In these circumstances, there is no showing that its failure to use its inventory of parts for making such instruments was so clearly attributable to its war work that the Board was wrong in disallowing this amount as an allocation of the inventory loss to renegotiable business.[19]
54. There is no persuasive evidence that the $94,782 of development expense allowed as a cost of renegotiable business was not a fair measure of expense incurred by the plaintiff in the development for production of the solenoids it made under its wartime contracts. If it was, its allowance as an expense of renegotiable business was neither more nor less than that. It can scarcely be regarded as a concession based on the direction of the statute and the regulations to consider *61 the plaintiff’s contribution to the war effort and the risks it incurred in undertaking war production.
55. (a) The Board’s minutes indicate that Barker stated at the meeting on June 10, 1947, that, in determining the amount by which the plaintiff’s profits on renegotiable business were excessive, a credit of $150,000 had been allowed in recognition of its contribution to the war effort.
(b) When Barker testified, he recalled that, in fixing the plaintiff’s renegotiation liability, he had allowed a substantial amount — $100,000 or more — in recognition of its contribution to the war effort. But he was completely unable to state how the amount of this purported allowance was determined, or how it was translated into a tangible credit against the plaintiff’s renegotiation liability, which otherwise appears to have been fixed at $240,000 by strict bankers’ standards, with no recognition (other than this purported $150,000 credit) of either the plaintiff’s contribution to the war effort, or of the fact that, in concentrating all its manufacturing resources on war production, it had incurred risks of detriment to its civilian business and risks of substantial reconversion problems.
(c) Both the risk of detriment to the plaintiff’s civilian business, and the risk of difficulty in reestablishing its lost civilian market had obviously matured long before the renegotiation was completed.
(d) The fact that the plaintiff had a serious conversion problem in recapturing its former share of the hearing aid market was already apparent, in June 1946, when Chris-tenat proposed a renegotiation liability of $70,000, and in August 1946, when the Board proposed a renegotiation liability of $150,000. The fact that the plaintiff had encountered financial, technical, and other business difficulties in its efforts to meet its reconversion problems does not indicate they did not exist, but confirms their existence. In disregarding them, Barker misinterpreted the standards he was directed by the statute and the regulations to apply.
(e) Neither the Board’s minutes nor Barker’s testimony— or any other evidence in the record — shows how Barker fixed the amount of the purported $150,000 credit, or how it was applied, if it ever was, in reduction of any amount the Board *62 bad found would have been the proper measure of plaintiff’s excessive profit, except for its contribution to the war effort. As far as the evidence shows, the $150,000 credit was nothing but words.
(f) In view of the clear and uncontradicted evidence that the Board determined the plaintiff was entitled to a credit of $150,000 for its contribution to the war effort, against the amount by which its profits were otherwise excessive, and, in the absence of evidence that any such credit was ever effectively applied to accomplish any reduction in its renegotiation liability, it is found that the $240,000 gross liability assessed by the Board, and assumed by the plaintiff through the renegotiation agreements, exceeded by at least $150,000 the amount the Board actually found to be excessive.
56. (a) If the $150,000 credit had been applied against the $240,000, the gross amount of the plaintiff’s renegotiation liability would have been $90,000, instead of $240,000.
(b) Adjusted to reflect the plaintiff’s commensurately altered tax liability for the period renegotiated, the plaintiff’s approximate net renegotiation liability would have been about $36,500, instead of $114,118.07.
(c) Additional refunds of somewhat more than $43,000 would have been available to the plaintiff through higher carryback tax credits resulting from application of the $150,000 credit.
(d) Rounded to the nearest thousand dollars, the net improvement in the plaintiff’s financial position, between 1946 and 1951, that would have resulted from application of a credit of $150,000 against the $240,000 liability fixed by the Board, would have amounted to approximately $121,000, consisting of a reduction of somewhat more than $77,500 in its liabilities and an addition of somewhat less than $43,500 in cash from additional tax refunds.[20]

*63
The Damages Claimed

The net amount of the renegotiation liability
57. After tbe Board fixed the plaintiff’s renegotiation liability at $240,000, in June 1947, and the plaintiff, despairing of timely relief through proceedings in the Tax Court, entered the renegotiation agreements of September 1947, which provided for installment payments of that amount, less applicable tax credits, the. plaintiff’s books recorded a net renegotiation liability of $114,118.07.
The amounts paid by the plaintiff against the liability
58. Aside from such effect as the renegotiation liability may have had on the plaintiff’s taxes, the plaintiff’s only direct, out-of-pocket cost attributable to the gross renegotiation liability of $240,000 was $7,280 — $5,000, paid when the liability was settled in 1951, and $2,280, which the defendant applied against it out of invoices due the plaintiff.
The nature and amount of the plaintiff’s claim
59. (a) The plaintiff claims, however, that the Board’s establishment, in June 1947, of an ostensible but unwarranted and excessive liability of $240,000, so impaired its credit, then, and during the immediately succeeding years until the liability was settled in 1951, that its reconversion efforts were impeded to an extent which prevented it from regaining, during that period, and thereafter maintaining, the relative position in the hearing aid industry which it had held in 1944.
(b) It claims that, as a consequence, it has been damaged by the renegotiation to the extent of the amounts which it, and its principal officers, would have realized from its hearing aid business as profits and enhanced salaries, if, in the absence of the added impairment of its already shaky credit that was caused by the renegotiation liability, it had perfected its reconversion, regained the relative position it held in the industry in 1944, and continued thereafter, to the present and into the future, to share, in commensurate proportion, in the earnings realized by the hearing aid business generally.
Included also among the damages claimed are estimated costs of restoring the public image of its product, and of *64 reestablishing an adequate internal staff and an adequate national system of distributors and dealers, as well as other smaller items hereafter listed.
(c) The amounts the plaintiff claims total somewhat over $5,500,000, up to January 1960. They include lost profits, $3,810,025; diminution of principals’ salaries, $558,714; cost of reestablishing lost public recognition of the plaintiff’s product through advertising, $500,000; estimated minimum cost of establishing and training a national system of distributors and dealers, $362,549; estimated minimum cost of attracting and training a competent internal staff, $200,000; losses on obsolete inventory sold as scrap, $81,018; and interest and penalties to January 1960 on withholding taxes.
(d) According to the plaintiff’s theory of damages, some of the amounts claimed would increase until it is reimbursed, on the assumption that, had it not been for the damage done to its business by the renegotiation, it would continue indefinitely to earn profits, and its officers would continue indefinitely to receive salaries, at a higher rate than any they are likely to receive as the plaintiff’s business is now situated.
The evidence does not support the amount of damages the plaintiff claims
60. (a) This record does not afford an evidentiary basis for finding damages in the amounts claimed by the plaintiff, or other specific damages of comparable kind, but different in amount.
(b) Whether the plaintiff would have succeeded in reestablishing its prewar position in the hearing aid industry, despite its difficulties with its first postwar model, if there had been no renegotiation, or if the amount of its renegotiation liability had been substantially less, depends on many contingencies wholly unrelated to the renegotiation. To the nature and effect of such contingencies this record gives no clue.
(c) Whether, if the plaintiff had succeeded in regaining its relative prewar position, it would have succeeded also, against all the hazards of a highly competitive business, in maintaining its relative earning capacity through all the *65 years since, is similarly conjectural. Tbe evidence does not dispel the obvious possibility that, even if the renegotiation liability had been less and had been fixed sooner, at a time when the plaintiff could have paid it, other difficulties might nevertheless have frustrated the plaintiff’s success.
(d) The availability to the plaintiff of $240,000, or $150,000, or any other amount of additional apparent equity, between 1947 and 1951, doubtless would have improved its opportunities to procure credit to finance its reconversion and to meet its business expenses, including those created by the commercial failure of its first postwar model. But how much additional credit it could have procured then, if its renegotiation liability had been less, or nonexistent, cannot be determined from this record. There is no way to tell whether it would have been enough, if wisely used, to change substantially the subsequent course of the plaintiff’s business. Nor is there any assurance, even if it were enough, that problems which could not be overcome merely by the availability of more credit would not have defeated the plaintiff’s expectations.
(e) It is possible, of course, that if the plaintiff had been freed of all or a substantial part of the renegotiation liability, it might have accomplished the results on which its claims for damages are based, or more. It is likewise possible, however, that it might have accomplished less, or failed entirely, for reasons having nothing to do with the amount of apparent liabilities on its books between 1947 and 1951. This record does not show what factors might have affected its business since 1947 or what their effect might have been.
(f) In summary, the hypothetical availability of whatever additional credit the plaintiff might have obtained if its renegotiation liability had been less does not in itself afford any guaranty, either that the plaintiff’s business would have become again as successful in relation to the overall fortunes of the hearing aid business as it was in 1944, or that it would have continued so until today.
That is essentially what the plaintiff asks the court to find. The evidence does not support the measure of damages the plaintiff proposes.

*66
Equitable Measures of Damage

Alternative measures of damage not precluded
61. The Board’s failure to determine the plaintiff’s excessive profits promptly, and in conformity with the applicable law and regulations, obviously compounded the plaintiff’s difficulties in attempting to reconvert to its civilian business. Equitable recompense for the detriment it suffered, as a consequence, is not necessarily precluded by the fact that its damage cannot be measured by a speculation as to what its fortunes might have been if the renegotiation had been handled differently.
The credit purportedly allowed by the Board affords a fair measure of damage
62. (a) The gross renegotiation liability imposed by the Board was at least $150,000 higher than it should have been, according to the Board’s own determination that the plaintiff was entitled to a credit of $150,000 which, as far as the evidence shows, it never got.
(b) The purported credit of $150,000 was said by Barker to be in recognition of the plaintiff’s contribution to the war effort. The evidence does not tell what factors were considered in fixing its amount, or who fixed it.
To the extent Barker may have been responsible for it, it is clear from his testimony that it would reflect no conscious consideration of risks to the plaintiff’s civilian market, or risks of impediments to its reconversion.
On the other hand, in view of Barker’s apparently casual reference to it and the fact that there is no evidence that it was ever really made effective, it may well have been one of the things he considered his colleagues responsible for seeing that he did not overlook, and which, in deference to them, he mentioned, in passing, but did nothing about. If so, it may represent the views of the Board’s staff and its other nominal members concerning the overall credit to which the plaintiff should have been entitled under the law and the regulations. Thus the amount may have derived from a broader evaluation of the plaintiff’s contribution and *67 its risks than Barker’s inconclusive testimony about it would suggest.
(c) Whatever its genesis, the credit suggested by the Board appears to afford a reasonable basis for measuring, approximately, in dollars, the contemporaneous effect of the error that resulted from Barker’s failure to consider the risks the plaintiff had incurred by its concentration on solenoid production.
63. (a) If, through a credit of $150,000 against excessive profits of $240,000, the basic renegotiation liability had been limited to $90,000, the plaintiff would have been entitled to retain overall profits of $375,384, for the period subject to renegotiation.[21] The annual rate of such profits (over $300,000) is enough higher than the plaintiff’s prewar rate of annual profit on hearing aid sales (about $144,000) in 1944, to preclude a finding that the reduction failed to reflect a substantial allowance for the plaintiff’s risks as well as for its contribution in devising the solenoids.
(b) If the $150,000 had been effectively applied as a credit against the $240,000 liability finally fixed, the plaintiff’s gross liability of $90,000 would have been only $20,000 more than the liability fixed by Christenat in June 1946.[22] In contrast, however, it would not have depended upon allocation to renegotiable business of expense items of dubious relevance to the production of solenoids.
(c) If the $150,000 credit had been effectively applied, the resultant gross liability would have been smaller by $60,000 than the $150,000 proposed in the Board’s second try at finding the plaintiff’s excess profits in August 1946. In that determination, the Board rejected Christenat’s allowance of two categories of expense, designated “Expense of maintaining dealerships” and “Commissions.” It gave no evidence, however, of reflecting, by any alternative allowance, any consideration of the plaintiff’s contribution to the war effort or of the risks it incurred in concentrating its resources on war production.
*68 (d) If, instead of making three tries, over a period of 21 months, at sorting ont allocations of civilian business expense to war production (with resultant determinations of liability ranging from $70,000 to $150,000 to $240,000), the Board had merely granted a flat credit, at the outset, in some reasonable amount, in candid recognition of the plaintiff’s wartime contribution and the risks it took in concentrating on solenoid production, it could have achieved a fair result, consistent with the applicable law and regulations, at a time when the plaintiff still could have paid the liability out of available funds.
(e) In summary, if the Board had made effective, against the $240,000 liability it ultimately imposed, the $150,000 credit Barker said the plaintiff was entitled to receive, but which apparently it never got, it would have reached a reasonable result that could be justified as reflecting, fairly and directly (instead of by juggling of accounts), consideration of the plaintiff’s war contribution and the risks it took in concentrating on war production. No substantial reason is apparent why (except that it consistently ignored some of the applicable standards) the Board should have failed to do this at the outset, or, at the latest, upon review of Christenat’s initial determination in the summer of 1946.[23]
(f) The plaintiff was willing to accede to Christenat’s proposed refund. The liability determined by Christenat was not much smaller than that finally fixed by the Board would have been if the $150,000 credit had been made effective. The plaintiff had adequate funds to make such a payment in 1946. It is a reasonable inference that, if the Board had acted promptly and in accord with the applicable *69 standards, the plaintiff could have paid a reasonable obligation, firmly fixed in 1946, and thereby freed itself of the liability which, instead, encumbered its operations between 1946 and 1951.
(g) Whether, if the renegotiation liability had been disposed of in 1946, the plaintiff would have had better success in regaining its market than it did, cannot be adjudged on the evidence in this record.
It is clear, however, that the Board’s obvious confusion about how to apply the prescribed standards in the plaintiff’s case resulted in the imposition of an additional and excessive encumbrance upon the plaintiff’s reconversion effort at a time when it had become powerless to remove that encumbrance by paying the obligation. That need not have occurred had the Board carried out its responsibilities from the beginning, with a proper regard for all the factors it was obliged to consider. The Board’s basic error, coupled with the consequent delay and the ultimate fixing of an excessive liability, created a burden which substantially diminished whatever chances the plaintiff had of success in its reconversion efforts.
Restoration of amounts of which the renegotiation deprived the plaintiff
M. For the reasons summarized in finding 60, it is impossible to justify paying the plaintiff what it might have realized if, freed of the added credit impediment created by errors in the renegotiation, it had overcome all other obstacles to a successful reconversion, and had recovered and maintained its prewar position in the hearing aid industry.
In the circumstances, the least that could be done now, in recompense for the damage that resulted from the renegotiation, would be to restore, in cash, the net amount of $121,000[24] which the plaintiff would have had in 1946, partly in cash and partly as an enhanced basis for credit, in the form of reduced liabilities, if the Board had acted promptly and properly. By such a payment, at least the amount of the financial basis for additional credit of which the plaintiff was deprived in 1946 would be restored.
*70 Whether, as a result of such a belated restoration, the plaintiff may be able to achieve, henceforward, success comparable to that it might have achieved had the renegotiation been prompt and consistent with the applicable standards, it is impossible to foretell. At least it would have its chance.
Compensation for delay
65. (a) It is less clear whether, in order to accord a fully equitable remedy, it would be appropriate to include, in addition, compensation for delay in the plaintiff’s realization of the cash or of the credit base of which it was deprived as a result of the faulty renegotiation, and, if so, whether the base for computing such compensation should be limited to the $43,500 of tax refunds it failed to receive in cash, or should include, as well, the $77,500 of excessive liabilities imposed on it, which it never paid but which, for about 4 years, impaired its access to credit in amounts that cannot now be ascertained.[25]
(b) It is evident from the circumstances at the time, and from the plaintiff’s subsequent history, that it probably would not have invested at interest any cash it would have received through tax refunds, or the proceeds of any additional credit base it would have had between 1946 and 1951, if its renegotiation liability had been less. Instead, it doubtless would have employed both in its operations, subject to all their risks.
(c) Nevertheless, there appear to be substantial equitable grounds for compensating the plaintiff for delay in payment of the approximately $43,500 additional cash it should have received through tax refunds if the renegotiation had conformed with the prescribed standards.
(d) Reasons for adding $84,000, or any other amount, as compensation for delay in the availability of the approximately $77,500 of additional book equity the plaintiff would *71 have had as a result of reduced liabilities, are less readily apparent. The plaintiff would have had to pay interest on any amounts it might have borrowed against its enhanced equity, and such charges would approximately offset any reasonable payments for delay.

Amount of Equitable Liability

66, Taking account of all factors, a payment of $172,550 ($121,000+$51,550) would come about as close as it is now possible to come, without improvident reliance on conjecture, to according the plaintiff equitable compensation for the detriment it suffered as a consequence of the Board’s failure to give effective consideration, at an early stage of the renegotiation, to its wartime contribution and to the risks it incurred in concentrating its manufacturing resources on war production.

 This case was referred and the petition filed in 19,5,8, well before the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962). In those circumstances we think it proper to file this report without reference to the Supreme Court’s opinions in that case. See Jefferson Constr. Co. v. United States, 168 Ct. Cl. 648, 649, fn. 1 (1964). Defendant’s motion to dismiss for lack of jurisdiction is denied.

 Another type of solenoid, perhaps perfected as a result of plaintiff’s solenoid, was used in another hind of bomb rach.

 This year included some Rearing aid business, but largely involved the war jobs.

 A third bar to a legal claim, but not to equitable relief, is the failure to pursue the Tax Court remedy. This is discussed, infra.

 The Price Adjustment Board did not act finally until June 1947, plaintiff did not agree until September 22, 1947, and it did not deem the renegotiation refund a liability until 1948.

 Plaintiff insists that the commissioner erred in assigning this “commercial disaster” in 1947 to these other factors, rather than the pressures of the -war work, because he thought that the company lost only $42,641 on its hearing aid business during the period of the solenoid contracts. The actual loss, plaintiff says, was upwards of $186,000. The commissioner’s figure comes from the minutes of the Price Adjustment Board’s meeting in June 1947. Plaintiff takes its figure from some attachments to the bilateral renegotiation agreement of September 1947. We think that the commissioner made an allowable election to rely on the amount stated in the Board’s minutes and on which it acted; the tabulations in which the other figure appears expressly state that “the figures shown in this Exhibit A have been taken from financial data submitted by the Contractor” and accordingly would appear to have less warrant than the $42,541 which we know the Board actually considered1. In any case, there is no indication that the commissioner’s appraisal of the “commercial failure” in 1947 depended to any degree on his view of the extent of the loss plaintiff suffered on its civilian business during the period of its war contracts.

 At six percent, this amounted to about $47,000 as of September 1964, and will amount to about $51,550 by June 1, 1966.

TRe plaintiff no longer presses claims initially asserted for compensation for services and for the value of an invention.

 OSRD had been established within the executive offices of the President, by Executive Order dated June 28, 1941, for purposes which included:
*****
b. Serve as the center for the mobilization of the scientific personnel and resources of the Nation in order to assure maximum utilization of such personnel and resources in developing and applying the results of scientific research to defense purposes.
c. Coordinate, aid, and, where desirable, supplement the experimental and other scientific and medical research activities relating to national defense carried on by the Departments of War and Navy and other departments and agencies of the Federal Government.
d. Develop broad and coordinated plans for the conduct of scientific research in the defense program, in collaboration with representatives of the War andl Navy Departments; review existing scientific research programs formulated by the Departments of War and Navy and other agencies of the Government, and advise them with respect to the relationship of their proposed activities to the total research program.
e. Initiate and support scientific research on the mechanisms and devices of warfare with the objective of creating, developing, and improving instrumentalities, methods, and materials required for national defense.

 Barrett was not attached to either Re5f or Re-l-d but was part of a Reconversion unit, designated Reid.

 As indicated below, in finding 18, tbe Aurex-designed solenoid was not used in tbe Modification 8 and! 9 forms of tbe bomb rack.

 Subsequent findings relate to the circumstances leading to the plaintiff’s undertaking volume production of these solenoids, and the effect of that activity on the plaintiff’s hearing aid business.

 Barrett, as well as Dumke, had known Huth long before this and they had had prior business associations.

 None of the Navy personnel who hail worked on the solenoid project testified to any specific recollection of Barrett transmitting a sample solenoid or of testing a sample solenoid submitted by Barrett, but the plaintiff’s letter dated May 8, 1944 (a Monday), which initially submitted its proposal for manufacture of the 50 solenoids, preliminary models of which had already been tested during April, contained the following statement:
In compliance with your request in your telephone conversation this morning, Mr. E. L. Barrett is taking a sample of the Aurex Solenoid to deliver to you in person, along with a copy of this letter which is addressed officially to the Bureau of Ordnance.
On April 14 you requested that we submit a proposal to supply you with 50 sample Solenoids of our design for your testing purposes. At the same time you gave me a schedule of proposed tests for this device. In this connection we are pleased to submit the following proposal.
It is a reasonable inference that this is the sample Barrett remembered delivering to Commander Dostal, who was head of Re-l-d.

 Beltone’s president testified that Beltone’s sales Increased from $279,950 in 1944, to $882,286 in 1945, to $1,495,843 in 1946, to $2,630,558 in 1947, to $3,099,340 in 1948, andi to almost $4 million in 19419. The plaintiff’s sales decreased, between 1944 and 1947, from $610,144 to $402,696, and its profits from hearing aid sales, from about $144,000 to a loss of $185,678.

 As -will appear subsequently, tbe amount actually repaid by tbe plaintiff to tbe defendant as a result of renegotiation was only $5,000, tbe amount for which it settled tbe asserted renegotiation liability of $240,000. The renegotiation bad its major impact on tbe plaintiff’s financial situation, not through out-of-pocket repayments of war profits to tbe defendant, but through whatever effect tbe existence of the asserted renegotiation liability, and the steps taken to enforce it, bad on the plaintiff’s credit, and through any consequent impairment of its ability to finance its operations from either private or public credit sources.

 The plaintiff appears to have cured whatever technical deficiencies its new instrument had. In later years its instruments were highly regarded by the Veterans Administration, which critically evaluated the available hearing aids on a competitive basis, and by eminently qualified' doctors who specialized in audiology. It did not, however, ever recover its former dominant position in the commercial market for hearing aids.

 Christenat concluded that plaintiff’s operating profit on renegotiable business, -without adjustment for development expense, was $327,945, before the proposed refund of $70,000, and would be $257,945, after the refund'. After deducting $94,782 for development expense, he reported $233,163, as operating profit on renegotiable business, before the proposed refund, and $163,163, after the refund. He regarded the plaintiff’s profit on nonrenegotiable business during this period as $163,689. He reported total profits as $491,634 ($327,945+$163,6S9), before the proposed renegotiation refund, and $421,634 thereafter. Adjusted to reflect the allowance of development expense, the total profits would be $3,96,852, before the refund, and $326,852 thereafter.

 The Board’s subsequent communication -with the plaintiff, in August 1946, which is described in finding 39(b), indicates that these costs included $70,924, designated “Expense of maintaining company dealerships” and “Commissions,” which Christenat allocated to renegotiable business, but it is not clear whether it also included some of the other costs later disallowed by the Board.

 The difference of $3,237 was attributed to a period not subject to renegotiation.

 In Christenat’s report, these Items, insofar as they were allocated to renegotiable business, totaled $70,924.

 According to the Board’s minutes, the revised profit figures on which this conclusion was based were $531,809, total operating profit for renegotiable business, and a loss of $42,541 on nonrenegotiable business, or a net aggregate profit of $489,268 on all business for the period covered by the renegotiation. Deducting the $240,000 from these figures leaves an adjusted operating profit of $291,809 on renegotiable business and $249,268: on all business.

 There is evidence that the plaintiff also made unsuccessful efforts during 1947 to obtain credit from private sources to enable it to meet its renegotiation liability and to finance its business.

 The plaintiff’s recoras Indicate that, late in 1947, It received, in addition, a carryback refund of $69,410.71, based on operating losses in fiscal 1947 and 1948.

 Barker testified, for example, that he had not been Informed that the plaintiff’s commercial production of hearing aids had ceased as a result of its conversion of its plant to war work. It is quite clear from other evidence that he was so informed, or, at least, that the information was available to him.
He testified that, according to his view, there was no connection between the plaintiff’s war work and the maintenance of its postwar market. The risk that the plaintiff’s suspension of development and production of hearing aids while it concentrated on production of solenoids might create substantial problems for it in reconverting to its prewar business, and the fact that it had created such problems, were plainly evident, and should have been apparent to anyone having the information that was available to Barker.
Barker testified that he assumed that the plaintiff had sought out the Navy after developing its ideas for improvement of the solenoid. There was ample evidence available to him, in June 1947, that the Navy had sought the plaintiff’s aid, but Barker said that would have made no difference in his decision anyway.
He made it clear that he would not have regarded as attributable to the plaintiff’s war production any effort or cost the plaintiff expended to preserve Its civilian market against deterioration caused by the concentration of its manufacturing resources on war production, although he justified ignoring the plaintiff’s expenditures in attempting to maintain its civilian market principally on the ground that he was informed that deterioration of service by the plaintiff’s local representatives was caused exclusively by some of the local dealers who were jewelers, taking jobs in precision industries.
In other respects as well, Barker’s testimony reflects a disregard of some of the standards he was directed by the statute and the regulations to follow, and of evident facts pertinent to the application of such standards.

Treating as expenses of solenoid production, either (1) costs of maintaining goodwill for civilian business or (2) inventory losses not clearly shown to be attributable to suspension of hearing aid manufacture would have been, at best, a dubious expedient for measuring a credit which, under the law and the regulations, was justifiable on less artificially contrived grounds. It well might have been in violation of §§ 1603.381, 1603.384, andl 1603.385 of the Board’s regulations (see finding 33(c)). Moreover, allocation to renegotiable business of costs not clearly shown to be attributable to war production has an illusory precision that could have created an unmanageable precedent for other cases.
The fact that the amounts, totaling about $191,500, referred to in this finding and in finding 52, were found not properly allocable as expenses of renegotiable business need not, however, have precluded the Board from granting a credit in a similar amount, or in some other suitable amount, in recognition of the plaintiff’s contribution to the war effort, and of the risks, induced by its concentration on war work, that its civilian market would, be impaired and that it would have serious reconversion problems.

 It cannot be determined, now wbat additional amounts of credit (if any) tbe plaintiff might have been able to procure, between 1946. and October 1951, if its accounts bad shown $77,500 less of liabilities than they did during that period. Many factors, in addition to its net equity position, could have affected the amount and the kinds of credit it might have gotten. The conclusion is inevitable, however, that if its apparent liabilities had been $77,500 less than they were, the likelihood of its obtaining additional credit would have been substantially increased.

 Instead of $225,000, under the Board’s action, as it was made effective.

 The net liability of $36,500 after tax credits would have been only $8,500 more than the $28,000 of net liability under Christenat’s determination.

 The standards specified in the statute and the regulations are not especially cryptic. Christenat’s report shows he knew what they required to be considered. The plaintiff’s contribution to the war effort was made quite clear at an early stage in the negotiations. The risk of loss of its civilian market had already matured, by the summer of 1946, into an obvious actuality. And it was by then plainly evident that the plaintiff had incurred acute reconversion problems as a consequence of concentrating on solenoid production.
The only reason suggested by the evidence for Christenat’s effort, and the efforts of the plaintiff, to establish a credit by allocation of civilian business expense to renegotiable business, is a general awareness that Barker, who appears to have had the final say, would give no consideration to claims for credit candidly based on some of the factors the law and the regulations directed the Board to consider.

 Nor tie composition of tils amount, see finding 56

 Measured, at 6 percent, from September 1946, compensation for delay in payment of $43,500 of tax refunds would amount to about $47,000 as of September 1964, and about $51,550 through May 1966.
Compensation, measured at the same rate, for delay, oyer a similar period, in the plaintiff’s realization of the benefit to its financial structure that would have occurred if its apparent liabilities had' been less by $77,500 than they appeared to be between 1946 and 1951, would amount to almost $84,000 (as of September 1964).